[No. C. D. 1816. *En Banc.* May 1, 1952.]

*In the Matter of the Discipline of* BRYCE LITTLE,
*an Attorney at Law.*[1]

[1]Reported in 244 P. (2d) 255.

*A. Vernon Stoneman,* for board of governors.

*Alfred H. Lundin* and *Robert M. Burgunder,* for respondent.

OLSON, J.—The state bar association filed charges of professional misconduct against the respondent, Bryce Little, who was admitted to the bar of the state of Washington in May, 1932. It prayed that he be disciplined as the facts and law warrant. A hearing lasting three days was had upon the charges before a trial committee of the bar association, at which both the association and the respondent were represented by counsel. The record of the testimony exceeds five hundred pages, and includes forty-five exhibits. The report of the trial committee is twenty-nine pages in length. This entire record was reviewed by the board of governors of the state bar association, who permitted respondent and his counsel to introduce additional exhibits and to argue the matter, both orally and in writing. The record so made, together with the report and recommendations of the board

of governors and the exceptions of the respondent to that report, has now been reviewed by this court.

The care which has been taken in this proceeding, and the particularity with which it has been explored, are in keeping with the gravity of the problem which faces those concerned with the discipline of a member of the bar. The bar association must discharge the responsibility it has been given by the legislature, and which it owes to the profession and the general public, for initiating proceedings, when necessary, and bringing them to the court for ultimate decision. We think it has done so fairly and completely in the matter now before us.

Three of the eight grounds of complaint against respondent arise out of his alleged co-operative action with one Edward P. Garrett, a former lawyer in the state of Minnesota who was disbarred there in 1922. Garrett had established himself in the city of Seattle as a private detective, and gave particular attention to the investigation of personal injury claims. It was his practice to obtain a contract of employment with an injured person to investigate the facts of his injury for a contingent fee of sixteen and two-thirds per cent of any recovery. He had compiled a list of attorneys with whom he had discussed his investigating services and made arrangements for co-operation. If the injured person had no lawyer, it was Garrett's practice to suggest that he select one from this list. The attorney selected was asked by Garrett, or the claimant himself, to undertake the legal work to establish the claim, on the evidence supplied by Garrett, under a separate agreement with the claimant for a contingent fee for legal services of sixteen and two-thirds per cent of any recovery. The record shows that the usual contingent fee charged by members of the bar in Seattle for similar services is thirty-three and one-third per cent of the recovery.

Respondent's name was upon Garrett's list. The trial committee found that he worked with Garrett in three cases, each of which is the basis of one of the grounds of complaint. In one of these cases, a settlement was made for three thou-

sand dollars. Respondent retained six hundred dollars (or twenty per cent), forwarded his check to Garrett for five hundred dollars (or sixteen and two-thirds per cent), and paid the remainder to the client. In another case, respondent interviewed an injured person with whom Garrett had a contract, but no employment of respondent finally resulted. Respondent withdrew from the third case before it was finally concluded, partly because he was to be absent from Seattle when the claim needed attention, and partly because he knew that the bar association was investigating Garrett.

Respondent contends that he did not know Garrett's background or the nature of his activities. He further submits that the record shows that several attorneys in Seattle cooperated in Garrett's plan. This fact, of course, is immaterial in respondent's case and cannot excuse him. This thin veil of protection, supposedly afforded by the fact that Garrett had the names of several attorneys on the list he submitted to injured persons, is not sufficient to conceal the improper features inherent in the situation. It, of itself, does not justify a claim, such as respondent makes, of lack of knowledge of or participation in the arrangement because he was only one of many mentioned to the claimant, and was not particularly chosen by or at the suggestion of Garrett.

The Canons of Professional Ethics pertinent to the Garrett transactions are Nos. 27 and 28, 34A Wn. (2d) 136, 137. These canons, in so far as material here, declare that it is unprofessional for a lawyer (Canon 27) to solicit professional employment through touters, and (Canon 28) to seek out those who claim personal injuries, or to employ agents or runners for like purposes, or to reward, directly or indirectly, those who bring or influence the bringing of such cases to his office.

RCW 2.48.220 [cf. Rem. Rev. Stat., § 139-14] provides, in part, that an attorney may be disbarred or suspended for several causes arising after his admission to practice, two being material here:

"... (9) Practicing law with or in cooperation with a disbarred or suspended attorney ... or practicing

law under any arrangement or understanding for division of fees or compensation of any kind with a disbarred or suspended attorney or with any person not a licensed attorney. . . .

"(11) Violation of the ethics of the profession."

 The grounds of complaint against respondent upon these charges are sustained by the evidence. The trial committee properly considered the Garrett transactions as a whole and in their relationship to each other, and correctly found, as did the board of governors, that respondent "had actual knowledge of, and intent to participate in and profit by the activities of Garrett."

A further ground for complaint alleges that respondent failed to account for and converted certain funds to his own personal use. It is based upon the following transactions. Prior to the 6th day of October, 1947, respondent, together with W. B. Dell and Lawrence A. G. Hanson, planned the formation of a corporation to be known as Quality Pork Products, Inc. Contributions to the capital of the proposed corporation were paid to respondent, to be held by him for corporate purposes. At the same time, respondent and Hanson were stockholders in a corporation known as the Coastal Trading Company, and respondent was one of its directors.

October 6, 1947, Dell delivered his check to respondent in the sum of one thousand dollars, payable to Quality Pork Products, Inc., as a portion of Dell's contribution to its capital. Respondent endorsed this check, "Pay to George W. Rourke, Agent, or his order, Quality Pork Products, Inc., by Bryce Little, President," and delivered it to Rourke. This was done prior to the incorporation of Quality Pork Products, Inc., and was for the purpose of paying an obligation owed by Coastal Trading Company to Rourke for an insurance premium on one of its boats. Respondent claims that, when he endorsed the check and delivered it to Rourke, he discussed the matter with Hanson and relied upon Hanson's statement that Dell had consented to the use of his check for that purpose.

Respondent claims that he had completely forgotten the transaction, and that no record of it was made upon the corporate books because of the very casual method in which they were kept. He testified that his attention was not called to it again until December, 1949, when the receiver for Quality Pork Products, Inc., demanded payment of this item from respondent, as an asset of the insolvent corporation. He then obtained a check for the principal sum, without interest, from Coastal Trading Company, which the receiver refused to accept because it was made payable to Dell. Respondent retained this check and gave the receiver his personal check in the sum of one thousand dollars. No interest was ever paid on this item.

Dell's original check of October 6, 1947, was returned to him in the regular course of business. He claimed that he did not discover the purpose for which it was used until shortly before the receiver discussed it with respondent. The endorsement did not show that it was not used in payment of an obligation of Quality Pork Products, Inc. The corporation did not receive the funds represented by the check, although it became insolvent during the two-year interval mentioned, and efforts to raise money for it, including additional subscriptions from stockholders, were discussed on many occasions.

Canon of Professional Ethics No. 11, 34A Wn. (2d) 129, is pertinent to this ground of complaint. It provides, in part:

" . . . Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

The trial committee concluded that this ground of complaint was not sustained. It found that Dell's testimony was not credible and did not overcome the evidence that respondent was authorized to use the check as he did. The fact that Dell had the check in his possession after it was cashed, was significant to the committee in its finding that

he knew or could and should have known what happened to the money at a much earlier date than he professed, and that he had approved the use of the check to make the original payment to Rourke. It also found that respondent did not receive or use any portion of the money himself. It further found that the responsibilities for the bookkeeping and accounting for the corporation did not rest exclusively upon respondent, and that all of the information regarding the transaction was available to the interested parties, each of whom was active in the management of the concern, and that they would have discovered it had they efficiently and intelligently looked after the affairs of the corporation. The committee considered that this charge was not for negligence in keeping records and accounting for funds received, but for misappropriation in the original transaction.

Contrary to the finding of the trial committee, the board of governors concluded that this ground of complaint was sustained; that respondent diverted the funds from the proper payee without authorization, and that the amount of the check did not reach the payee. It further decided that respondent did not account for or report the trust fund so delivered to him, and that his action preventing a report or account of the trust fund was a violation of his professional duty.

The evidence upon these issues was in sharp conflict. In proceedings of this nature, we have applied the rule that we will not ordinarily disturb the factual findings of a trial committee made upon conflicting evidence. The trial committee, before whom the witnesses appeared, was in a better position to judge their veracity and candor, and evaluate their testimony, than is either the board of governors or this court. We cannot say, from the record, that the evidence clearly preponderates against the trial committee's findings, and we will, therefore, accept them. *In re Foster, ante* p. 1, 10, 239 P. (2d) 1060 (1952), and cases cited. The conclusion follows that the charges against respondent on this ground of complaint have not been sustained.

A further ground of complaint is founded upon the following factual situation. When Quality Pork Products, Inc., became involved in financial difficulties, respondent decided that a receivership was necessary to protect creditors and stockholders against a threatened action by an employee.

Respondent procured the services of a young attorney to bring an action against the corporation on behalf of W. B. Dell, as a basis for the receivership. Respondent drew the complaint and it was signed in his office. Respondent also engaged another young attorney to appear for the corporation. The receivership was presented to the court as an adversary proceeding, and the court was not informed and did not know that respondent had procured the services of counsel for Dell and the corporation, nor was it informed that respondent owned the land upon which the corporation had erected its plant, and that no documents, other than the corporate minutes, had been prepared or executed regarding the rights of the corporation to this tract of land.

During the hearing, an attorney who officed with respondent was suggested to the court, by respondent and the two attorneys presenting the matter, as one suitable for appointment as receiver, and the court entered an order appointing him. The judge who made the order testified, in this proceeding, that, had he known all of the facts, he probably would not have appointed this attorney as receiver. The judge further testified that, in making his report to the court, the receiver was not familiar, even to a limited extent, with the matters upon which he was reporting, and had frankly stated that the figures which he gave in his report were supplied by respondent. At a hearing for the removal of this receiver, the disclosure of respondent's connection with the corporation and ownership of the land upon which it had built its plant, indicated the adversity of the receiver's interests to those of respondent. This caused the court to suggest that the receiver resign, so that a successor could be appointed. No fees were paid to the first receiver or to the attorneys appearing in the receivership proceeding when it was initiated.

It is significant that it was only after the first receiver was removed and his successor appointed that the one-thousand-dollar asset of the insolvent corporation, arising out of the Dell check involved in the previous charge against respondent, was collected for the insolvent corporation.

The trial committee found that this receivership proceeding was, in itself, proper, but that respondent had deliberately set out to place himself in a position to control and guide the receivership indirectly, knowing that his connection with. the corporation and interest in the action prevented his doing so directly. RCW 7.60.020(6) [cf. Rem. Rev. Stat., § 741]. It further found that respondent did not make a full and complete disclosure to the court of all material matters when the receiver was appointed. It concluded that the conduct of respondent in this regard was improper and was a violation of his oath and duties as an attorney and officer of the court. RCW 2.48.220(3) [cf. Rem. Rev. Stat., § 139-14]. The board of governors concurred in this conclusion, and we find that this charge is sustained by the record.

We will not discuss the other grounds of complaint against respondent. The trial committee and the board of governors were of the opinion that they were not sustained, and we are not urged to consider them. More than that, from our examination of the record, we think this determination is correct.

The trial committee recommended to the board of governors that respondent receive a reprimand upon the charges which we have discussed under the heading of his activities with Garrett. It further recommended that he be suspended from the practice of law for a period of sixty days for his conduct in connection with the receivership.

The board of governors disagreed with the trial committee, as we have pointed out, upon the matter of the one-thousand dollar check. The board made no specific recommendations to the court with regard to each of the charges which it felt was sustained, but concluded that, upon the record as a whole, respondent should be suspended from

the practice of law for a period of six months, and so recommended to this court.

■■ A matter such as this is always a serious one, and presents problems which are without complete analogy in the consideration of other legal proceedings. It is civil, not criminal, in its nature. *In re Jett*, 6 Wn. (2d) 724, 729, 108 P. (2d) 635 (1940). Yet we consider it to be quasi-criminal, in that it is for the protection of the public and is brought for the misconduct of the lawyer involved. Its consequence is punitive, unavoidably so, despite the fact that it is not designed for that purpose. It is not an adversary proceeding. Truly, it is a special proceeding peculiar to itself, in which the court, with the assistance of the bar association, inquires into the conduct of an officer of the court and a member of that association, and, if necessary, exercises its inherent power to discipline the accused.

The respondent in such a matter is, upon his admission to the bar, certified by the court to have then attained high moral and professional standards. It is to be presumed that he has maintained them and has performed his duty as an officer of the court in accordance with his oath. Every doubt should be resolved in his favor, and only upon a clear preponderance of the evidence that the acts charged have been done, and were prompted by improper motives, should disciplinary action be taken. The privilege—and it is a privilege, not a right—to practice his profession cannot be lost to the practitioner upon slight evidence.

As is true in each case, there are various circumstances applicable to this accused which are urged in mitigation and should be considered. Among these are the motives and purposes which actuated his misconduct and the lack of gravity or serious consequences of it, his attitude toward the proceeding against him, his experience and training, his general characteristics and nature, his previous good record, and the likelihood and probability that he will not again transgress. These subjects of consideration do not excuse improper conduct. They only aid the court in arriving at a fair and moderate determination of the necessary discipline which duty requires it to impose.

■ The action to be taken rests within the sound discretion of the court. This discretion is wide, and, as is true in every instance where it has no well-defined boundary, it must be exercised with extreme care and caution to avoid its abuse. Its limits in each case are determined by the evidence then before the court. The final adjudication should provide neither more nor less than the facts fairly require to penalize the offender, deter others, and indicate to laymen and members of the bar that proper discipline will be enforced and the standards of the profession maintained.

With these matters in mind, and upon careful consideration of the whole record of the sustained charges, more than a mere reprimand must be imposed upon this respondent. His conduct cannot be justified, as he would have us do, upon the claim that it was the result of the press of an active legal practice and of his participation in a great many business enterprises. His intelligence, background, and experience should have warned him that some of the demands for his attention should have been rejected, if they became too numerous or diverse to permit him to give each matter proper care.

■ We adopt the recommendation of the trial committee. The respondent should be, and he hereby is, suspended from the practice of law for a period of sixty days, the period of suspension to commence thirty days after the filing of this order.

SCHWELLENBACH, C. J., MALLERY, GRADY, HAMLEY, DONWORTH, and WEAVER, JJ., concur.

HILL and FINLEY, JJ. (dissenting in part)—We dissent from the sixty day suspension; the circumstances warrant only a reprimand.