[No. 32820.   Department Two.   August 30, 1954.]

GEORGE E. MILLER LUMBER COMPANY, *Appellant,* v.
C. R. HOLDEN, *Respondent.*[1]

[1]Reported in 273 P. (2d) 786.

*Melvin C. Rooney* and *James O. Ballou*, for appellant.

*Ronald Moore* and *Jerome Walstead*, for respondent.

SCHWELLENBACH, J.—George E. Miller is an individual doing business as George E. Miller Lumber Company, with principal offices in Portland, and is engaged in the business of buying, selling and dealing in lumber and lumber products. C. R. Holden is doing business as Holden Lumber Company, with principal offices in Longview, and is engaged in the business of buying, selling, manufacturing, and remanufacturing lumber and lumber products. For some time prior to the transactions herein involved, the two firms had dealt quite extensively in fir, but not in alder.

This action was commenced by Miller. The complaint, in its first cause of action, alleged the sale of fir at the agreed and reasonable value of $11,648.85, which sum was due and unpaid. This was admitted by the defendant, and judgment was rendered for that amount.

The second cause of action was for breach of warranty in the sale of rough alder which, it was alleged, was ordered by plaintiff. The complaint alleged that plaintiff paid defendant $17,419.51 at time of shipment, but that plaintiff's purchaser rejected the shipment because the lumber was not manufactured according to specifications; that he was forced to sell at a loss, to his damage, in the sum of $11,-469.01, for which sum he asked judgment.

The defendant cross-complained for fir lumber sold to plaintiff for the agreed price of $12,816.24, which sum was due and owing. Plaintiff answered that the lumber involved was not according to specifications; that he was compelled to sell the same at the best price obtainable, and that, after incurring expenses of sale, there remained the sum of $2,376.20, which he applied to defendant's indebtedness as shown in the first cause of action.

The case was tried to the court. It dismissed the second cause of action (alder); granted plaintiff judgment for $11,648.85 on his first cause of action; granted defendant judgment for $12,632.04 on his counterclaim; offset plaintiff's judgment against defendant's judgment, resulting in a net judgment for defendant in the sum of $983.19. Plaintiff appeals. We shall discuss the alder and the fir transactions separately.

All of the transactions were handled between Mr. Holden and T. J. Osborn. Osborn at one time had worked for Holden, but had been employed by Miller for three or four years. He testified, when called as a witness for the plaintiff, that he was employed by the Miller Company as an agent. He was asked:

"Q. You handled all the phases of the transaction as agent for the plaintiff with Mr. Holden? A. Yes."

As stated above, neither of the parties had dealt in alder. Osborn testified that in February, 1951, he was in Holden's office and Holden told him that he was going to have some alder and wanted to know if Osborn could sell it. Osborn said he thought he could, and telephoned the McKinney Hardwood Company in Los Angeles. As the result of a series of telephone calls between March 3rd and April 10th, McKinney ordered 300,000 feet. Accompanying the order was the following letter:

"McKinney Hardwood Co.                                April 13, 1951

"WHOLESALE LUMBER

"George E. Miller Lumber Company

"Portland, Oregon

"ATTENTION:   Ted Osborn

"Dear Sir:

"Confirming our several telephone conversations with you we are inclosing herewith our formal order covering 300,000 feet 4/4 to 12/4, #2 Common and Better Alder, rough, green, to be shipped by boat to Los Angeles.

"Please be sure that this stock is cut heavy enough so that it will dry out to full thickness when kiln dried.

"It is our understanding that you now have the larger portion of this stock on the dock at Longview and that it is stacked on lath so that it will not damage from being bulk piled.

"If this stock proves satisfactory we feel sure that we can use a quantity of from 100,000 to 300,000 feet per month and as soon as this shipment arrives and we have an opportunity to see what it is like we will forward an additional order covering our future requirements.

> "Yours truly,
> "McKINNEY HARDWOOD CO.
> " [Signed]   S. A. McKinney
> "S. A. McKinney"

April 16th, Miller mailed a formal order to Holden:

"ALDER LUMBER #2 COMMON & BETTER ROUGH GREEN

" (Cut to allow to dry for full thickness when Kiln Dried).

"100M      4/4
  50M      5/4
  30M      6/4
  80M      8/4
  25M     10/4
  15M     12/4                                      $64.00

c c: Port Dock

> "GEO. E. MILLER LUMBER CO.
> "By        T. J. Osborn
> " [Signed]   T. J. Osborn"

In the meantime, Holden had been delivering alder to the dock, ready for shipment, under a verbal order. As the loads were delivered, he invoiced Miller and received payment. The invoices were dated March 3rd, 16th, 31st, April 20th, and May 9th. The entire order was shipped in

one load May 10th. Upon its arrival in California it was rejected. There is no question but that the alder was not up to specifications. It was mismanufactured, thin, and narrow. In a letter to Osborn, written May 16th, McKinney explained in detail in what respects the lumber was not acceptable, and then stated:

"We are sorry that this initial shipment turned out so badly as we had hoped from your description of the stock that it would be good material and that we would be able to do a nice volume of business with you on it."

Osborn testified that he talked to Holden over the telephone after the alder had been rejected, and that Holden suggested that Osborn try to sell it and if the claim was not too large he would stand behind it. This was denied by Holden. September 21st, Osborn wrote to Holden telling of his inspection of the alder in California and of his efforts to resell. He wrote:

. "I pass this information on to you and would appreciate it very much if you would give us your opinion of what to do. I consider any losses on this lumber for your account, due to mismanufacture. I have checked into the situation very thoroughly and am positive that my consideration is correct.

"This is one of the unfortunate things that happens to the wholesaler. We are definitely in the middle. If the customer is unhappy the only thing we can do is pass it on to the supplier. If the supplier is wrong it is up to him to pay for his own shortcomings."

He received no reply to this letter. Osborn finally sold the alder to Tropical Western Hardwood Company for $12,000, the best price obtainable.

Holden, on the other hand, gave a different version of the transaction. He told of a conversation with Osborn in December, 1950, or January, 1951. He testified:

"A. Ted said to me, 'There is a lot of alder moving.' I said, 'Yes, the market—' This is recollection of the conversation as I recall it. Ted says, 'There is a lot of alder moving.' And I said, 'Yes.' He said, 'The market must be pretty good.' Then he asked, 'Can you saw alder?' I said, 'I haven't any alder, but I sure can get some.' He said, 'You get some and see what you can do, and I will see what I can do.

There is a good market.' And he said, 'It will probably take a couple of bucks to get started, but we can shove it in and break it off. We can build it up.' "

Holden testified that he made an investigation, found that he could get alder logs, called Osborn and so advised him; that at their next meeting Osborn verbally ordered 150,000 feet; that, as to the manufacture:

"A. He said, 'Cut it heavy.' I said, 'What do you mean, heavy?' He said, 'Cut all the 8/4s and 12/4s you can.' I said, 'How else should we do it?' He said, 'Cut it right on the nose, the net size.' "

Holden testified that he advised Osborn that his men were not familiar with alder and that Osborn suggested that they get his (Osborn's) brother, that he had worked with alder; that they put the brother to work as a resaw man to saw alder; that after they had placed a considerable amount on the dock they were advised by an outside source that their alder was cut net and that it should be larger; that he called Osborn in his Portland office and said:

"A. I said, 'Ted, this alder should be oversize. Everybody else's lumber on the dock is a different size than ours. Are you sure about this net business?' And he said, 'Sure I'm sure.' I said, 'You better look at it. We are getting a lot of it up there.' So he told me in this particular conversation, he said, 'You stay right with that net. If there is any difference, I will let you know.' "

He testified that Osborn called back in a day or two and said:

" 'You are right, Charlie. Start cutting oversize.' I said, 'We will be in trouble with that on the dock, won't we?' This was over the telephone. He said, 'No, the market down there is hotter than a firecracker.' And I said, what about the 4/4s, is that the right size? He said, 'That is all right. We have good connections and we won't have any trouble with that.' "

He also testified that one time Osborn was in the yard with another man when they were cutting and he asked Osborn how it looked, and he replied, "Fine, Fine"; but that they should have at least another 150,000 feet.

Arthur Lewis, Holden's plant foreman, testified that Osborn was in and out of the plant three or four times a week, and sometimes twice a day; that he told Lewis, in quite some detail, how to cut the alder. He testified to a conversation at about the time the first 150,000 feet of the verbal order had been filled.

"A. He asked me if we could produce more. I said it looked like we could, and to see Mr. Holden. He said if you can, go ahead and put it on the dock and I will arrange it with him."

The trial court found that

". . . said lumber was cut according to the directions of the plaintiff's agent and inspected by the plaintiff's agent and accepted by the plaintiff's agent and duly and regularly paid for by the plaintiff in this action, and that the plaintiff was at all times fully aware of the kind and nature of the lumber accepted by them and paid for by them; that the plaintiff at no time acted as a broker or agent for the defendant; that there is no evidence of any warranty by contract or implication on the part of the defendant, that the defendant, at all times, followed the plaintiff's instructions in the manufacture and production of said alder lumber."

The trial court believed respondent and his witnesses and did not believe Osborn and his witnesses. He had the benefit of observing the witnesses on the stand, their candor or lack thereof. The testimony was extremely conflicting, and we cannot say, from our examination of the testimony and exhibits, that the evidence preponderates against the court's findings.

The cross-complaint is in connection with, first, a verbal order, and then a written order, for 300,000 feet or more of 2x4 to 2x12 No. 3 common Douglas Fir. We shall not detail the testimony, which was also in direct conflict. Here, also, the trial court believed the testimony of respondent and his witnesses and did not believe Osborn and his witnesses.

In the early part of March, 1951, Osborn received an order from the Carroll Mills of Sedro Woolley for No. 3 common Douglas Fir to be shipped to a customer of Carroll's in

Alaska. Osborn approached Holden to make up an order of at least a half million feet. Holden told him that he had very little stock on hand. He delivered what he had to the dock. Shortly afterwards (March 27th) the written order came through. It called for twenty-five per cent 2x4s. Holden told Osborn that he did not have any 2x4s or any stock to make 2x4s out of. About a month later, it developed that Carroll refused to ship to the man in Alaska because his credit was not good. Also, there was a general reduction in the price of lumber. Osborn told Holden to hold the lumber on the dock for awhile and the market would go back up. In July, Osborn had the fir inspected. It did not meet the specifications. Osborn then sold it to a stevedoring concern for dunnage, at the best price obtainable.

Before any lumber was placed on the dock, Osborn was around the yard several times. He told them to start putting up the lumber and that he did not care about sizes. He was interested only in volume. On one occasion, when they were grading, he said: "That don't even need grading. Send it as it is. That looks good. We want to get it up there." This was all denied by Osborn, but, as we have heretofore stated, the trial court believed respondent and his witnesses.

On the counterclaim, the court found: that the defendant, at the special instance and request of the plaintiff, sold and delivered to the plaintiff lumber which had a reasonable, agreed, and actual value in the sum of $12,632.04; that part of said lumber was picked out of the defendant's yard by the plaintiff's agent, and the balance of the lumber was inspected and accepted by the said plaintiff, and he was fully aware that it was mill run and made no objection to the kind, grade, and size of said lumber, and that no objection was made until plaintiff was unable to sell the lumber because of his customer's credit rating; and that there was no warranty, either expressed or implied. The evidence as to this transaction does not preponderate against the court's findings.

We have considered the assignments of error—all one

hundred ten of them. Obviously, space will not permit a discussion of each assignment, but we shall discuss them in groups.

Appellant's first contention is that certain findings of fact are conclusions of law and should be disregarded. In this connection, appellant proposed eighty-six findings, each of which was evidentiary. Two recent decisions of this court make it clear that findings of fact which are really conclusions of law will be treated as conclusions of law and will stand if there are other findings of fact sufficient to support the conclusions. *Freeman v. Stemm Bros., Inc.*, 44 Wn. (2d) 189, 265 P. (2d) 1055; *Hauser v. Arness*, 44 Wn. (2d) 358, 267 P. (2d) 691. Rule 17, General Rules of the Superior Courts, 34A Wn. (2d) 118, does not require the trial court to make findings in regard to every item of evidence, but only ultimate findings of fact are sufficient. See *Bowman v. Webster*, 42 Wn. (2d) 129, 253 P. (2d) 934; *Eickerman v. Eickerman*, 42 Wn. (2d) 165, 253 P. (2d) 962. In *Keller v. Waddington*, 142 Wash. 474, 253 Pac. 646, we said:

"There was a finding on every material issue, and the findings are general only in the sense that the court found the ultimate, rather than the evidentiary facts. There is no requirement by statute or by general rule that the court find more than the ultimate facts, nor more than those that are material."

In *Kinnear v. Graham*, 133 Wash. 132, 233 Pac. 304, where we considered the findings in the light of the court's oral decision, we said:

"The purpose of findings is to enable this court to review the questions upon appeal, and when it clearly appears what questions were decided by the trial court, and the manner in which they were decided, we think that the requirements have been fully met."

Although the findings of fact in this case cannot be considered as models, still, they are findings of ultimate facts, and, with the aid of the memorandum opinion, we are able to review the questions decided by the trial court, and the manner in which they were decided. Appellant, in sup-

port of his motion for new trial, submitted a memorandum consisting of nineteen grounds why the motion should be granted. We are satisfied that each of the grounds was considered by the trial court.

Appellant strenuously contends that there were breaches of implied warranties as to the sale of both the alder and the fir, and calls our attention to the following sections of the sales act:

"Where there is a contract to sell or a sale of goods by description there is an implied warranty that the goods shall correspond with the description, . . ." [RCW 63.04-.150]

"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, there is an implied warranty that the goods shall be reasonably fit for such purpose;

"(2) Where the goods are bought by description from a seller who deals in goods of that description, there is an implied warranty that the goods shall be of merchantable quality;

". . .

"(5) An implied warranty or condition as to the quality or fitness for a particular purpose may be annexed by the usage of trade; . . ." [RCW 63.04.160]

In view of the fact that both parties were unfamiliar with alder lumber, we do not see how appellant can claim any warranties under RCW 63.04.160. Appellant did not rely on respondent's judgment in any respect, and respondent could not be classified as a dealer in alder. Neither can appellant depend upon the usage of the trade to give him any implied warranties. Since both parties were strangers to the hardwood trade, they could not have contracted with reference to custom and usage. It is obvious that Osborn did not rely on Holden's skill and judgment in connection with the sale of the fir. As we shall show later, there were no implied warranties intended.

Neither do we feel that RCW 63.04.150 applies. There were no implied warranties here that the goods would conform with the descriptions. These were not "across the counter" transactions, where the parties were dealing at arm's length. These were not the kind of transactions which were intended to be covered by the warranty statutes. Here, as to the alder, Osborn saw an opportunity to open up a new field, and, as to the fir, he saw an opportunity to make a quick profit. He went into respondent's yard and directed the cutting, grading, and shipping. He was interested in speed and volume. He was confident that the demand for these products would overcome all obstacles. To use the parlance of the street, he was interested in "making a fast buck." It was not until after the deals fell through that he then, for the first time, thought that he might have recourse to implied warranties because of the specifications contained in the written orders. We are satisfied that no warranties were contemplated, and we are unable to find any upon which appellant can rely.

The trial judge, who saw and heard the witnesses, was able to comprehend the situation, as shown by his order denying the motion for new trial:

"Osborn was the agent for the plaintiff, he is the only person with whom the defendant dealt. Osborn apparently had full and unlimited authority to purchase lumber, and the defendant was in the business of selling lumber. Plaintiffs contention that the alder lumber was to be cut according to specifications of the McKinney Hardwood Company of Los Angeles is not sustained by the evidence. In fact Osborn admitted in his testimony that he talked to Holden after he had McKinney's order, but did not tell Holden who his customer was.

"True there is evidence in the record, or at least testimony, of written orders and specifications in both the Alder and Fir transactions, and from which a breach of warranty could be inferred, but in the considered opinion of this court no reliance was placed upon such specifications, and no attention was paid to them by either party.

"Osborn saw this lumber on the dock, and in the process of delivery. He had full knowledge of the defendants facilities, experience and product. He was under no compul-

sion to take it unless it met with his approval. It was there for his inspection and examination. He could take it or leave it. He accepted it and shipped it away, and in the case of the Alder, he paid for it, and no complaint was made until he encountered difficulty in his attempt to resell the same.

"The whole course of conduct between these parties indicate that the defendant had lumber to sell. Osborn, in his anxiety to get lumber, took anything that was offered to him in the hope of making a profit upon the resale of the said lumber, and if there was any intention by either party that this lumber was to meet any specifications, it is not supported by the action and conduct of the parties, nor supported by the testimony as believed and interpreted by the court."

What we have heretofore said disposes of appellant's next contentions as to agency and that the evidence does not support the findings.

■ Appellant contends that the counterclaim for fir alleged a sale of goods at the special instance and request of appellant, and that respondent was thereafter permitted to prove the contract. As part of his proof, respondent offered exhibit I, which was an order by appellant for 300,000 feet or more of No. 3 common Douglas Fir at a price of $56 per thousand. This exhibit was admitted without objection. The invoices submitted by respondent when the lumber was delivered, list the price at $56. Later, after exhibit I had been admitted without objection, by way of separate reply and affirmative defense, appellant alleged that the lumber did not meet the specifications as to size contained in the order. The burden of proving this allegation, as we have seen, was not sustained to the satisfaction of the trial court, which held that there was no intention by either party that the lumber was to meet any specifications. Furthermore, there was no objection by appellant as to the reasonableness of the price. His objection was solely to the failure to comply with the specifications. Respondent's purpose in introducing the order and the invoices was not to claim under a contract, but merely to show the price and that the lumber was delivered. We find no variance.

Finally, appellant complains of misconduct of counsel for respondent, in that he repeatedly made improper remarks and made improper objections. The record is replete with improper and unnecessary remarks and objections by both counsel, which should have been stopped by the court. In justice to counsel who wrote the brief, we wish to state that he did not try the case and gained his impressions of the proceedings from the cold record. We are satisfied that the continued sparring between counsel during the trial did not influence the court's decision in the least.

We find no merit in the other assignments of error, and will not discuss them.

The judgment is affirmed.

GRADY, C. J., HILL, DONWORTH, and WEAVER, JJ., concur.

[1]Reported in 273 P. (2d) 795.