[Nos. C.D. 4206, 4344. En Banc. January 27, 1972.]

*In the Matter of the Disciplinary Proceeding Against* ROBERT T. KENNEDY, *an Attorney at Law.*

*In the Matter of the Disciplinary Proceeding Against* LEONARD W. SCHROETER, *an Attorney at Law.*

*T. M. Royce,* for Board of Governors.

*Robert T. Kennedy,* pro se.

*William L. Dwyer,* for respondent Schroeter.

STAFFORD, J.—This is a disciplinary action instituted by the Washington State Bar Association against Mr. Robert T. Kennedy and Mr. Leonard W. Schroeter. Although two items of complaint were lodged against each attorney, the second has been dismissed on recommendation of the board of bar governors.

The hearing panel (hereinafter called the panel) took testimony following which findings of fact, conclusions of law and recommendations were prepared and forwarded to the Board of Governors sitting as the disciplinary board (hereinafter called the board). The board reviewed the panel's findings, conclusions and recommendations and adopted them as their own. For the sake of clarity we shall hereafter refer only to the panel's findings of fact and conclusions of law.

The board concluded that Canons of Professional Ethics (hereinafter called CPE) Nos. 11[1] and 22[2] had been violated and recommended that this court suspend Mr. Kennedy

---

[1]Canon of Professional Ethics 11—"Dealing with trust property. The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

[2]Canon of Professional Ethics 22—"Candor and fairness. The conduct of the lawyer before the court and with other lawyers should be characterized by candor and fairness.

"It is not candid or fair for the lawyer knowingly to misquote the contents of a paper, the testimony of a witness, the language or the argument of opposing counsel, or the language of a decision or a textbook . . .

"It is unprofessional and dishonorable to deal other than candidly

from the practice of law for a period of 30 days and repri-
mand Mr. Schroeter.

The record reveals that Mr. Merton Fitzsimonds died as
the result of an automobile collision in 1964. His widow
retained Mr. Kennedy and Mr. Schroeter to represent her
in an action for his wrongful death. In November 1964 she
entered into a written contract of employment in which she
agreed to pay them 33⅓ per cent of the gross recovery.[3]

The case, originally set for trial in May of 1967, was
continued. Thereafter, in June of 1967, nearly 3 years sub-
sequent to Mr. Fitzsimonds' death, the widow married
Peter Markos. She failed to inform either of her lawyers.

Mrs. Fitzsimonds (hereinafter called Mrs. Markos) was
notified that a deposition would be taken by defense coun-
sel. In preparation therefor she discussed the matter with
her lawyers. She conferred a second time with Mr. Ken-
nedy at her apartment. At the time Mr. Kennedy was un-
aware that Mr. Markos was in the bedroom. When the
deposition was taken, Mrs. Markos stated her name was
Katherine G. Fitzsimonds. Thereafter defense counsel asked
questions to which the following answers were made:

Q. With whom do you live? A. Myself. . . . Q. Can
you tell us generally how you are getting along so far as
financially is concerned, are you financially self-suffi-
cient? A. As long as I am working I guess I am, to a
certain extent. Q. What I mean, you are not getting
support from any other source other than your own? A.
No. Q. Your own assets? A. That is right. Q. And work-
ing ability? A. That is right.

The trial began September 18, 1967, but Mrs. Markos
waited until the fourth day to inform her attorneys of her
remarriage. That night Mr. Schroeter and his staff prepared

---

with the facts in taking the statements of witnesses, in drawing affida-
vits and other documents, and in the presentation of causes.

". . .

"These and all kindred practices are unprofessional and unworthy
of an officer of the law charged, as is the lawyer, with the duty of
aiding in the administration of justice."

[3]She was required to pay all costs and expenses out of her portion
of the recovery.

a brief in an attempt to exclude evidence of the remarriage.

The next day, the court was told of the remarriage. To justify the statements made in her deposition, a motion, supporting affidavit, and memoranda were introduced to explain why Mrs. Markos had remained financially independent of her new husband and had continued to use her former name.

The same day Mr. Kennedy presented Mrs. Markos with a new employment contract providing for a fee of 50 per cent of the gross recovery rather than the original 33⅓ per cent. The proposed contract bore the following heading:

> BECAUSE OF FAILURE OF CLIENT TO DISCLOSE TO HER ATTORNEYS FULL INFORMATION VITAL TO THE PROSECUTION OF THIS CASE, CAUSING ADDITIONAL WORK, AND LOWERING THE POSSIBILITY OF RECOVERY, THIS CONTRACT OF EMPLOYMENT IS REVISED AS FOLLOWS:

Mrs. Markos declined to sign until it had been seen by her husband.

The weekend intervened. In the meantime, additional mid-trial briefing was done to avoid an adverse result. Thereafter, the trial judge ruled that the fact of remarriage was inadmissible. Nevertheless, he also ruled that false answers contained in the deposition were admissible for the purpose of impeachment.

On Monday, the 25th of September, when Mr. Kennedy inquired again about the proposed contract, Mrs. Markos suggested that they discuss the matter with her husband. That evening Mr. Kennedy met the Markoses at their apartment. No agreement was reached. As Mr. Kennedy departed, he told the Markoses that they would be required to decide by morning whether to pay on an hourly basis or increase the fee to 50 per cent.

Prior to court the next morning, Mr. Kennedy and Mr. Schroeter met Mrs. Markos in Mr. Schroeter's office. Although Mr. Schroeter was anxious to leave for court, Mr. Kennedy insisted on discussing the fee. He testified that: "I said I was sitting here and getting an agreement out of her one way or the other." Mr. Kennedy further testified that

he told her the hourly fee would be approximately $10,000 plus $3,000 or $4,000 in costs, and that she finally "agreed to a 50% fee, saying 'maybe the 50 percent would be the best agreement' ". Mrs. Markos denied making that statement.

Inasmuch as Mrs. Markos had not returned the proposed 50 per cent contract, Mr. Kennedy dictated a letter to Mr. Schroeter's secretary, which he characterized as "better than a memo" that might have been signed by Mrs. Markos. It purported to memorialize the suppositious revised contract, in self-serving terms. Mr. Kennedy signed the letter, had Mr. Schroeter's secretary sign it on his behalf, and mailed it to Mrs. Markos. Mr. Schroeter denied seeing or reading the letter.

While Mr. Kennedy prepared the letter, Mr. Schroeter engaged in a settlement discussion with defense counsel. He requested enough money to "get his client 'out' with her costs". Defense counsel made a final offer of $7,500 which Mr. Schroeter discussed with Mrs. Markos. Believing that her total costs and expenses would be about $2,475, she accepted the offer.

Mr. Schroeter left the United States shortly thereafter and did not return until sometime in December. After his departure all transactions, with reference to the lawsuit, were handled by Mr. Kennedy.

In October 1967, Mr. Kennedy visited Mrs. Markos at her place of employment and asked her to sign the $7,500 draft that had been made payable jointly to Mr. Schroeter and to her. She asked for an opportunity to take it home, agreeing to sign and return it if her husband approved. She never returned the instrument.

Up to this point, neither Mr. Kennedy nor Mr. Schroeter had furnished Mrs. Markos with a statement of costs and expenses. No accounting had been made.

In November 1967, Mr. Kennedy telephoned Mrs. Markos and told her that if she failed to return the draft promptly he would have the insurance company cancel it and reissue one payable to the clerk of the court. He also informed her that upon reissuance he would draw out the money and pay

the 50 per cent attorneys' fees, costs and expenses. Mrs. Markos replied that she did not believe he could carry out his threats. Mr. Kennedy responded that he not only could, but would do it.

At this point, there can be no question that Mr. Kennedy knew a serious dispute existed over the so-called 50 per cent contract.

Following the foregoing encounter, Mr. Kennedy telephoned defense counsel and asked him to stop payment on the original draft and issue a new draft payable to the court. He did not reveal the dispute over attorneys' fees. Instead, he told defense counsel the change was necessitated because Mr. Markos was attempting to have his wife repudiate the settlement. A new draft was issued payable to the clerk of the court.

After the new draft was issued, Mr. Kennedy had Mr. Schroeter's law associate, Mr. Charles Talbot, sign a stipulation for an order dismissing the lawsuit. The order, presented to a court commissioner, also directed release of the $7,500 draft to Mr. Schroeter. On November 20, 1967, the court clerk endorsed the draft to Mr. Schroeter, Mr. Talbot receipted for it, and handed it to Mr. Kennedy.

Mr. Kennedy took the draft to Mr. Schroeter's office and had it deposited in Mr. Schroeter's trust bank account. Inasmuch as Mr. Schroeter's secretary was authorized to sign checks on the account, Mr. Kennedy had her issue checks in full payment of the attorneys' fees, based upon the disputed 50 per cent contract (one half being paid to Mr. Kennedy and one half to Mr. Schroeter). Also, checks were issued in payment of all other bills and expenses even remotely connected with the lawsuit. Mrs. Markos was not informed of these developments.

By early December, Mrs. Markos still had received no accounting of funds. Mr. Kennedy insists she could have come to his office to request an accounting. In spite of that, a client is not required to force an accounting from her attorney. CPE 11 places the burden upon the *lawyer* to

make a prompt accounting. Further, the record indicates that Mrs. Markos actually called on several occasions only to find Mr. Kennedy out of the office.

Mr. and Mrs. Markos consulted Mr. Josef Diamond, an attorney, and asked him to determine what had happened to the Fitzsimonds case. Mr. Schroeter informed Mr. Diamond that the money had been paid through the clerk of the court and had been completely disbursed. After expressing surprise, Mr. Diamond arranged for the Markoses to meet with Messrs. Kennedy and Schroeter at Mr. Schroeter's office. The meeting took place approximately 2 weeks before Christmas. Then, for the first time, Mrs. Markos was presented with a statement and an accounting which revealed the $7,500 had been entirely disbursed. $3,750 had been paid for attorneys' fees and $3,849.07 for other items of expense, none of which had been discussed with or approved by her. The $7,599.07 expenditure left Mrs. Markos owing her lawyers $99.07. Mr. Schroeter generously informed her "we will give you that as a Christmas present." Mrs. Markos' attempt to negotiate a compromise was unsuccessful. Both Mr. Kennedy and Mr. Schroeter refused to discuss accepting anything less than the $3,750 they already possessed.

Both Mr. Kennedy and Mr. Schroeter have filed objections to certain findings of fact and conclusions of law made by the panel as well as to the recommendations of the board. Although the foregoing facts apply to both attorneys, each has taken a different position. Thus, each will be dealt with separately.

### ROBERT T. KENNEDY

In the earlier stages of this proceeding Mr. Kennedy was represented by counsel. However, he has represented himself pro se before this court.

Mr. Kennedy "excepts" to findings of fact 3, 9, and 12 through 33. With the exception of findings 18, 19, 22 and 23, to be discussed later, he does not assert that they lack the required support of substantial evidence. *In re Wm. H. Sim-*

*mons,* 65 Wn.2d 88, 395 P.2d 1013 (1964); *In re Little,* 40 Wn.2d 421, 244 P.2d 255 (1952); *see also In re Dunham,* 124 Wash. 418, 214 P. 628 (1923). Rather, his "exceptions" are based upon an assertion that the panel's findings of fact include only evidence which justifies the conclusion that he violated CPE 11 and 22. He asserts that his testimony, and that of others, conflicts with that offered by the bar association. He devotes a considerable portion of his brief to rewriting most of the panel's findings of fact to indicate the manner in which he asserts they should have been written, had they contained *all* of the evidence. Based upon his redrafted "findings of fact", he challenges the panel's conclusions of law and submits his own.

In disciplinary actions this court will not ordinarily disturb the panel's (formerly the trial committee) findings of fact made upon conflicting evidence. The panel, before which the witnesses appear, is in a much better position to evaluate the testimony than we can possibly be from reading the record, complete though it is. *In re Little, supra; In re Foster,* 40 Wn.2d 1, 239 P.2d 1060 (1952); *In re Thacker,* 35 Wn.2d 605, 618, 214 P.2d 507 (1950).

Although a panel's findings of fact do not have the force of formal findings made by a trial judge, they are made by persons chosen to make them according to rules established by this court in carrying out its disciplinary activities. Such findings of fact are entitled to due weight in determining whether they support the conclusions of law and resulting recommendations. *In re Foster, supra; In re Thacker, supra.*

While the disciplinary rules for attorneys provide that the panel shall prepare findings of fact and conclusions of law, they do not specify the manner in which they shall be prepared. However, since the panel's findings and conclusions serve the same purpose as those entered by a trial court, there is no reason why they should be treated differently.

Drawing by analogy upon those cases which govern the preparation of findings of fact by trial courts, we hold it is only necessary to prepare findings of *ultimate* facts con-

cerning *material* issues. *Whitney v. McKay,* 54 Wn.2d 672, 344 P.2d 497 (1959); *Wentz v. T. E. Connolly, Inc.,* 45 Wn.2d 127, 273 P.2d 485 (1954); *Seattle Ass'n of Credit Men v. Green,* 45 Wn.2d 139, 273 P.2d 513 (1954). Recitals of evidence have no place in findings of fact. *Seattle Ass'n of Credit Men v. Green, supra; Bowman v. Webster,* 42 Wn.2d 129, 253 P.2d 934 (1953); *Warning v. Warning,* 40 Wn.2d 903, 247 P.2d 249 (1952). Thus, there is no need to make findings of fact on every item of evidence introduced in the case. *Seattle Ass'n of Credit Men v. Green, supra; Warning v. Warning, supra; Williamson v. United Bhd. of Carpenters & Joiners of America,* 12 Wn.2d 171, 120 P.2d 833 (1942). Such a resumé of the evidence would merely lead to confusion. 53 Am. Jur. *Trial* § 1142, p. 796 (1945).

The panel's findings of fact are sufficient to enable this court to review the issues, to disclose what questions were decided, and the conclusions reached. Thus, the findings of fact satisfy the requirements in *Seattle Ass'n of Credit Men v. Green, supra.*

We have reviewed Mr. Kennedy's proposed additions to the panel's findings of fact and find that they are not findings of *ultimate* fact concerning *material* issues. They are mere recitals, or resumés, of evidence in the case. They are neither a necessary nor a proper part of the findings of fact entered herein.

They do, however, require further comment. We would expect that one charged with a violation of CPE 22, governing candor and fairness before the court and with other lawyers, would use great care to insure the accuracy of his brief.

At page 29 of Mr. Kennedy's brief, it is said that the purpose of his proposed additions to the panel's findings of fact is:

to *include* the evidence placed in the records that shows a full and fair disclosure and complete candor and fairness plus Findings *on additional evidence* that will answer questions raised by the Hearing Panel.

(Italics ours.)

In explanation of the rewritten findings of fact, he states in part, at page 29:

(1) In reading the following proposed Findings and Conclusions the *underlined portions are those found or concluded by the panel.*

(2) The parts not underlined are Findings & Conclusions that should have been included.

(Italics ours.)

From the foregoing explanation it is logical to assume: (1) That unless specifically indicated, the underlined portions of the proposed findings of fact fully and completely set out the panel's findings of fact and do not omit material portions thereof; (2) That the underlined portions are accurate quotations, when taken as a whole; (3) That the underlined portions are not misleading.

We have made a word-by-word comparison of the panel's actual findings of fact with those reported by Mr. Kennedy. We find: (1) That in most cases the underlined portions do not fully set forth the panel's findings; (2) That there are major omissions from the panel's findings of fact which were not so indicated in the brief; (3) That some of the purported underlined "quotations" were inaccurate or entirely changed; and (4) That some of the purported underlined "quotations" were misleading.

A few examples follow. Unless otherwise indicated, the underlining reflects that made by Mr. Kennedy to indicate findings or conclusions made by the panel.

Mr. Kennedy's brief omits a material part of the panel's finding 13. It is reported as reading in pertinent part as follows:

the court was advised by motion and supporting affidavits and memorandum seeking exclusion of evidence or [*sic*] remarriage.

The purported quotation omits material data that followed immediately in the same sentence to explain apparently false answers given in Mrs. Markos' deposition:

the court was advised by motion and supporting affidavit

and memoranda seeking exclusion of evidence of remarriage, Mrs. Markos explaining her continued financial independence of her new husband and the reason for it.

Mr. Kennedy's brief reports the last sentence of the panel's same finding of fact as follows:

> She requested time over the weekend to think over how to pay the Attorneys for their additional services.

The panel's final sentence actually reads:

> This, Mrs. Markos declined to sign expressing the wish to take it home and show it to her husband.

Portions of the panel's finding of fact 14 are omitted, changed and inaccurately reported in Mr. Kennedy's brief.

The panel's finding of fact 15 is reported to have read in part as follows:

> Mrs. Markos then informed Mr. Kennedy that she would agree to pay them 50% of the recovery as a fee for the work . . .

In fact, the finding of fact actually reads in part:

> The next morning, September 26, Kennedy says, he told Mrs. Markos that the fee on an hourly basis would be approximately $10,000 plus costs and she then agreed to a 50% fee, saying *"maybe 50% (is) better."*

(Italics ours.)

Mr. Kennedy's brief omits most of the panel's finding of fact 16. However, one significant part that purports to be quoted from the panel's finding was never made by the panel. The part wrongly added reads:

> She acknowledged to the court that this settlement agreement was by her own free will and with full knowledge of all factors.

Mr. Kennedy's brief omits a major portion of the panel's finding 20. On the other hand, he purportedly quotes the panel's finding 23 at some length as follows:

> Mr. Kennedy then telephoned Mr. Sweet and informed him that Mrs. Markos refused to sign the draft and release and for his clients protection it would be best for

him to cancel that draft and pay the money directly into the court and counsel would draw it down from the court.

Comparison of the foregoing with the panel's actual finding reveals that Mr. Kennedy not only has misquoted it but has omitted entirely a portion that is basic to the charge of violating CPE 22. The omitted portion is italicized below:

Mr. Kennedy then telephoned Mr. Sweet and asked him to have payment stopped on the draft of October 20, 1967, and to issue a new draft payable to the court. Mr. Sweet complied having a new draft made out payable to the clerk of the court, reciting that it was in full payment of a stipulated settlement of the case. He sent this draft to Mr. Kennedy. *Mr. Kennedy told Mr. Sweet that Mrs. Markos' husband was trying to have Mrs. Markos repudiate the settlement, and for that reason it would be advisable to pay the money through the court. He did not tell Mr. Sweet that there was a dispute over attorneys' fees.*

Mr. Kennedy purportedly quotes from the panel's finding 30 as follows:

. . . Mrs. Markos accompanied by Mr. Markos finally came to the office for a conference with Mr. Schroeter and Mr. Kennedy. They were then presented with a statement of what had become of the $7,500 (Exhibit F 11).

The finding of fact actually reads:

About two weeks before Christmas, 1967, Mr. and Mrs. Markos succeeded in having a conference with Mr. Schroeter and Mr. Kennedy at Mr. Schroeter's office. There, for the first time they were presented with a statement of what had become of the $7,500.00 (Exhibit F.11).

It will be noted that the purported quotation completely changes the emphasis of the actual finding of fact.

Recitation of other examples will unduly lengthen the opinion. CPE 22 provides in part:

The conduct of the lawyer before the court and with

other lawyers should be characterized by *candor and fairness*.

> *It is not candid or fair for the lawyer knowingly to misquote the contents of a paper* . . .

(Italics ours.) Needless to say, the matters reported herein do not conform to the requirements of that canon.

Next, we shall consider Mr. Kennedy's "exceptions" to specific findings of fact. It is urged that findings of fact 18 and 20 are contrary to the evidence. We have reviewed the record and are convinced that each finding is supported by substantial evidence thus complying with the requirements in *In re Wm. H. Simmons,* 65 Wn.2d 88, 96, 395 P.2d 1013 (1964); and *In re Little,* 40 Wn.2d 421, 244 P.2d 255 (1952).

█ Finding of fact 19 is challenged as contrary to the evidence and because the last sentence is said to be a conclusion of law. The record indicates that the first part of the finding of fact is adequately supported. The last portion is, however, a conclusion of law. It reads:

> Under the circumstances, it must be concluded that the respondents could not show the fair and full disclosure and lack of undue influence necessary to a change of contract during the existence of the attorney-client relationship *Kennedy v. Clausing* 74 Wn 2d 483, 445 P. 2d 637 (1968) (to which respondent Kennedy was a party).

Nevertheless, since other findings of fact support this "conclusion of law", it may stand. *Miller Lumber Co. v. Holden,* 45 Wn.2d 237, 273 P.2d 786 (1954), *see also Freeman v. Stemm Bros., Inc.,* 44 Wn.2d 189, 265 P.2d 1055 (1954).

Mr. Kennedy's proposed conclusions of law are not relevant. They are either unnecessary to a decision of this case or are supported only by his proposed, but rejected, findings of fact.

Mr. Kennedy states that his case was heard at the end of 8 days of hearings which involved matters unrelated to the instant action. He suggests that the panel, being pressed for time, limited him to a showing of how the client's money was handled. He objects to having been prevented from

establishing that the revised fee (*i.e.,* 50 per cent of the gross recovery) was reasonable and justified.

The panel committed no error. The members acknowledged that Messrs. Kennedy and Schroeter had done considerable work. However, the panel was not concerned with the justification of a fee (*i.e.,* CPE 12). The issue was whether the two lawyers had dealt properly with their client's funds (*i.e.,* CPE 11). Thus, testimony or exhibits relating to the subject of fixing the amount of the fee (*i.e.,* CPE 12) were not relevant to any issue before the panel. It is equally irrelevant to any issue before this court on review.

■■ Mr. Kennedy has challenged finding of fact 23. However, it is adequately supported by the statement of facts. His original brief has furnished us with no reason for the "exception". Again, drawing by analogy from the rules on appeal, we have uniformly refused to consider an assignment of error for which no argument has been made. *Sepich v. Department of Labor & Indus.,* 75 Wn.2d 312, 450 P.2d 940 (1969); *Valente v. Bailey,* 74 Wn.2d 857, 477 P.2d 589 (1968); *see also* ROA I-43. Logic requires us to apply the same rule to a review of this nature.

Mr. Kennedy's *reply* brief suggests that finding of fact 23 is based upon incorrect or erroneous testimony and thus is in error. His assertion is based upon an affidavit of one who did not appear as a witness before the panel. The affidavit was submitted for the first time as an attachment to the *reply* brief.

There are two answers to his contention. (1) The argument was made for the first time in the *reply* brief. Points not argued and discussed in the opening brief are deemed abandoned and are not open to consideration on their merits. *Dickson v. United States Fid. & Guar. Co.,* 77 Wn.2d 785, 466 P.2d 515 (1970); *Fosbre v. State,* 70 Wn.2d 578, 424 P.2d 901 (1967). (2) The disciplinary rules for attorneys provide for the use of affidavits at only one stage of the proceedings. An affidavit is required when one attempts to obtain a new hearing, particularly when based on newly

discovered evidence. Otherwise, the rule is silent. We held in *In re Thacker*, 35 Wn.2d 605, 619, 214 P.2d 507 (1950), a case in which an affidavit was submitted under surprisingly similar circumstances:

> We have no disposition to establish a precedent that would invite appellants or respondents, in cases pending in this court, to file affidavits merely to impeach witnesses who testified in the cause during the trial thereof in the court below.

We did not consider the affidavits in *Thacker* and we have been given no reason to depart from our prior rule.

Mr. Kennedy suggests that much of what he did was to prevent Mrs. Markos from profiting by her lack of truthfulness. He attempts to justify his action as some kind of punishment for an avaricious client.

 While we do not condone a client's untruthfulness with either court or counsel, that issue is not before us. A lawyer's knowledge of his client's misconduct does not given him license to violate the canons of ethics either with regard to his handling of that client's funds or by failing to make a proper or timely accounting. The client's punishment is a matter for the courts or for criminal prosecution.

It is sufficient to say that the panel's findings of fact fully support the conclusion of law that Mr. Kennedy violated CPE 11 and 22.

### Leonard W. Schroeter

Mr. Schroeter was represented by counsel both at the hearing stage and before this court. His brief is limited to a discussion of those matters which support the board's recommendation of his discipline.

Basically the brief attempts to disassociate Mr. Schroeter from Mr. Kennedy's activities. For example, in referring to Mr. Kennedy's attempt to increase the attorneys' fee the brief states:

> This was entirely Mr. Kennedy's undertaking and not Mr. Schroeter's . . . Mr. Schroeter was busy with conducting the trial and trying to salvage a settlement.

He had no part in the conversations regarding fees
. . . .

The brief goes on to assert that all Mr. Schroeter knew of the so-called "agreement" to change the contract was what Mr. Kennedy told him; and, that subsequent to obtaining the $7,500 settlement "until mid-December Mr. Schroeter had nothing further to do with the matter and no knowledge of what was happening". This, he contends, includes the fact that he had nothing to do with the letter dictated by Mr. Kennedy, to which his own secretary appended his name.

This appears to agree with the panel's finding of fact on the subject. However, it is interesting to note that it is at odds with Mr. Kennedy's proposed findings of fact 18 and 28 which read in pertinent part as follows:

> ▆ The first person pronoun "me" was used in the first paragraph because Mr. Schroeter dictated this part of the letter . . .
> ▆ Mr. Schroeter was informed by letter and telephone of the different transactions in relation to the Fitzsimonds lawsuit as well as other office business.

Obviously, both versions cannot be correct. The panel believed Mr. Schroeter on this dispute of fact.

As between Mrs. Markos and Mr. Kennedy, Mr. Schroeter suggests that Mr. Kennedy is the more credible witness. However, considering the entire record before the panel, we cannot say it erred by believing Mrs. Markos rather than Mr. Kennedy, any more than it erred by believing Mr. Schroeter rather than Mr. Kennedy. The panel had the witnesses before it. It was in a better position than we to judge the veracity and to evaluate the testimony of those witnesses who appeared before it. *In re Little*, 40 Wn.2d 421, 244 P.2d 255 (1952); *In re Foster*, 40 Wn.2d 1, 239 P.2d 1060 (1952); *In re Thacker*, 35 Wn.2d 605, 214 P.2d 507 (1950).

Mr. Schroeter contends that the panel's finding of fact 33 is in conflict with the evidence. It reads:

The items of expense shown on the statement were

paid by Mr. Kennedy without consultation with Mrs. Markos and without her approval as to the amounts.

He agrees that the finding may be correct insofar as precise dollar amounts are concerned. He contends, however, it is erroneous as to the individual items and the approximate total amount which the client knew would be payable.

The worst that can be said is that the testimony is in conflict. That conflict was resolved against Messrs. Kennedy and Schroeter. Inasmuch as the evidence adequately supports the finding of fact it is not in error.

■ Mr. Schroeter excepts to the panel's conclusion of law that his actions breached CPE 11 and 22. His assertion seems to be based upon a contention that all of the unethical activities were carried out by Mr. Kennedy and the fault is his. Mr. Schroeter argues that there is no evidence that he had any knowledge of what had transpired until he attended the meeting with the Markoses in December. There, for the first time, he asserts, he learned of the failure to make a prompt accounting and of the accusation that funds had been distributed contrary to his client's wishes.

As a result, he has challenged the following recommendation of the board:

> Mr. Schroeter was not an active participant in the events after September 26, 1967; *however he ratified these acts in the December interview with Mr. and Mrs. Markos then knowing the fee to be disputed, no prompt accounting to have been made, Mr. Kennedy to have acted against the client's wishes, and fees to have been taken;* and, he has retained all his portion of the fee collected as his own. *It is recommended that Mr. Schroeter be reprimanded.*

(Italics ours.)

It must be noted that nothing in CPE 11 relieved Mr. Schroeter of the duty to provide his client with an accounting. Furthermore, he does not deny that subsequent to the telephone conversation with Mr. Diamond, he knew that an accounting had not been made. At that point in time he also knew that there was a serious dispute with the Markoses. In fact, he was informed that things had reached such a stage

that they planned to report the matter to the bar association. Nevertheless, Mr. Schroeter did nothing.

Assuming Mr. Schroeter remained unaware of all facts until the pre-Christmas meeting, he acquired full knowledge on that date and continued to retain the disputed funds. Thus, the panel concluded correctly that, by his retention of the funds, Mr. Schroeter ratified the prior acts of Mr. Kennedy.

The panel's conclusion that Mr. Schroeter violated CPE 11 and 22 is fully supported by the findings of fact.

## THE BOARD RECOMMENDATIONS

Although we give serious consideration to the recommendations of the board in all disciplinary proceedings, they are advisory only. *In re J. Lael Simmons*, 59 Wn.2d 689, 369 P.2d 947 (1962). In all disciplinary actions, the ultimate responsibility for determining the final action to be taken rests solely with this court. *In re Caffrey*, 63 Wn.2d 1, 385 P.2d 383 (1963); *In re J. Lael Simmons, supra; In re Durham*, 41 Wn.2d 609, 251 P.2d 169 (1952).

In making the determination we consider the seriousness and circumstances of the offense as well as the following standards:

1. A punishment of the offender, which should be sufficient to prevent reoccurrence.
2. A penalty sufficient to deter other practitioners from engaging in such conduct.
3. Punishment sufficient to restore and maintain respect for the honor and dignity of the profession, and to assure those who seek the services of lawyers that the penalties for unprofessional conduct will be strictly enforced.

*In re Pennington*, 73 Wn.2d 601, 440 P.2d 175 (1968); *In re J. Lael Simmons, supra*.

With these standards in mind, and considering the facts of this case, we decline to follow the board's recommendations.

Both attorneys shall be held jointly and severally

liable for paying into the trust fund of the Clerk of the Superior Court for King County, all attorneys' fees withheld in excess of those originally contracted for at the rate of 33⅓ per cent of the gross amount recovered. These trust funds shall not be withdrawn until the superior court has determined whether Mrs. Markos or Messrs. Kennedy and Schroeter are entitled to them or to any part thereof.

In light of the peculiar circumstances of this case, we do not believe the penalty recommended by the board comports with the standards set forth in *In re Pennington, supra;* or in *In re J. Lael Simmons, supra.*

Mr. Kennedy's suspension is increased from the recommended 30 days to 60 days, or until the disputed attorneys' fees are paid into the trust fund, whichever is longer.

Mr. Schroeter's penalty is increased from a reprimand to suspension for 30 days or until the disputed attorneys' fees are paid into the trust fund, whichever is the longer. Mr. Schroeter's 30-day suspension shall be consecutive to that previously imposed by this court in *In re Schroeter,* 80 Wn.2d 1, 489 P.2d 917 (1971).

The respective periods of suspension shall commence 30 days after the filing of this opinion. However, in the event a petition for rehearing is made and if it is denied, the respective periods of suspension shall commence 10 days thereafter.

We confirm the statement and supplemental statement of costs claimed by the Washington State Bar Association pursuant to DRA 7.1 *et seq.*

FINLEY, ROSELLINI, HALE, and WRIGHT, JJ., concur.

HAMILTON, C.J., HUNTER and NEILL, JJ., concur in the result.

Petition for rehearing denied March 17, 1972.