[No. C.D. 4249.   *En Banc.*   September 24, 1954.]

*In the Matter of Disciplinary Proceedings Against*
GEORGE W. ROBERTS, *an Attorney at Law.*[1]

*A. Vernon Stoneman,* for board of governors.

*Charles Snyder,* for respondent.

WEAVER, J.—The board of governors of the Washington state bar association presents to this court, for final disposition, its recommendation that respondent, George W.

[1] Reported in 274 P. (2d) 343.

Roberts of Walla Walla, Washington, be suspended from the practice of law for a period of thirty days. The recommendation confirms the report of a three-man trial committee which heard the matter.

The recommended suspension is based upon a finding of the trial committee that respondent violated Canons of Professional Ethics 27 and 7.

The portions of the canons involved read as follows:

"It is unprofessional to solicit professional employment . . . by personal communications or interviews not warranted by personal relations. Indirect advertisements for professional employment such as . . . the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible; . . ." Canon of Professional Ethics 27, 34A Wn. (2d) 136.

"Efforts, direct or indirect, in any way to encroach upon the professional employment of another lawyer, are unworthy of those who should be brethren at the bar; but, nevertheless, it is the right of any lawyer, without fear or favor, to give proper advice to those seeking relief against unfaithful or neglectful counsel, generally after communication with the lawyer of whom the complaint is made." Canon of Professional Ethics 7, 34A Wn. (2d) 127.

The specific factual questions presented are these: (1) Did respondent solicit the probation of an estate, which subsequently was appraised at approximately seventy-six thousand dollars? (2) Did respondent encroach, in any way, directly or indirectly, upon the professional employment of another lawyer?

Respondent was admitted to practice law in this state in 1916. Since 1922, he has specialized in tax work in Walla Walla. From 1938 to 1952, he had acted as an accountant and tax consultant for Carlos Gregory, Sr. On November 12, 1952, no matter of a tax or legal nature, concerning Mr. Gregory, was pending in respondent's office.

That evening, respondent read in the newspaper that Carlos Gregory, Sr., had died about three p. m. He testified that about nine p. m.

" . . . I called up Leonard DeWitt [a mortician] and I asked him, if when the relatives showed up if [*sic*] for Carl Gregory, I would appreciate it if he would have somebody contact me because I had a lot of information that would be very useful to the heirs of his Estate."

Respondent testified that, at the time, Mr. DeWitt told him

" 'Murray Taggart is looking after the Estate affairs.' "

Mr. Taggart is the prosecuting attorney of Walla Walla county and has been practicing law since 1948.

Concerning the information given him by Mr. DeWitt, respondent testified that

" . . . it was surprising to me that a man should be the Attorney for that Estate and in the absence of a Will, and no wife, and he died at 3:00 o'clock in the afternoon, and by 9:00 o'clock at night the Coroner says the Prosecuting Attorney is the Attorney for the Estate."

Respondent knew that decedent did not have a will, for he had discussed the matter with him a short time before his death. Respondent knew decedent had several children. He did not know that one son, Carlos Gregory, Jr., thirty-seven years old, had lived in Walla Walla for thirty-two years.

Carlos Gregory, Jr., consulted Mr. Taggart the same afternoon his father died. He told Mr. Taggart he wished him to handle the estate, subject to the concurrence of Claude, his brother who lived in Oregon, and Blanche Farnham, his half sister who lived in Idaho, who had not yet arrived in Walla Walla.

Carlos, Jr., and Mr. Taggart searched for decedent's will that afternoon. The next day, November 13, 1952, as a part of the search, Mr. Taggart telephoned respondent, who told him he did not have decedent's will and was positive that there was none. He did not tell Mr. Taggart that he had "information that would be very useful to the heirs of his Estate," nor did he disclose that he had a file containing copies of decedent's income tax returns for a number of years.

Mr. DeWitt, the mortician, telephoned respondent and told him that decedent's daughter, Mrs. Farnham, was at the Grand Hotel. About midday of November 14th, respondent telephoned Mrs. Farnham. He testified:

"I introduced myself to her and I told her who I was, and I told her that I'd worked for her father about 13 years and that I had information in the file in my office regarding his properties, and felt that the information that I had would be of great benefit to whoever had the handling of his affairs after his death.

"And I told her unfortunately that I couldn't be at the funeral because I was definitely committed to be at Connell at 10:00 o'clock on Saturday. . . . And that inasmuch as she was from out of the State and the funeral was Saturday, there would be no chance for her to see me after the funeral, no chance for me to contact them on Saturday and I wouldn't be back until Monday, and by that time they probably would have returned to Oregon and Idaho, so if they wanted to see me, I'd be glad to see them. And she said, 'Well, maybe we'll be over.' "

We note that respondent stated in his answer to the complaint of the board that

"I told Mrs. Farnham that if she and her brother from Oregon desired to see me while in Walla Walla for the funeral it would have to be that afternoon; and I invited them to come to my office if they wanted to see me."

Sometime during November 14th, Mr. Taggart met with the three children. As a result of that conference, Mr. Taggart considered that he had been employed to probate the estate.

Later that day, Mrs. Farnham and decedent's two sons, as a result of respondent's telephone call, went to his office. All three were strangers to respondent. (Carlos Gregory, Jr., testified his father had introduced him to respondent several times in Walla Walla but respondent had no remembrance of these occasions.)

It is undisputed that at least three things were mentioned at this conference: (1) the information which respondent had of decedent's affairs, especially as it related to a file containing copies of decedent's Federal income tax returns

for a number of years; (2) the probation of the estate; and (3) the fact that some of the heirs had previously consulted Mr. Taggart.

Except for respondent's denial that he solicited probation of the estate—which is a conclusion to be drawn from the facts—the testimony of what happened at the conference is not in serious conflict.

Claude Gregory summarized the meeting in the following language:

"And with this information that he had in regards to the account, he advised us that he felt that he knew more about our father's business than probably any other man in the City of Walla Walla, and was offering his services to us in the manner in which we understood that he had these accounts, that they would help us expedite in clearing up the matter, you know, in handling all of the things that are to be handled.

"And then he stated that my sister who lived in Lewiston, Idaho, and I in Springfield, Oregon, that he would be here to protect our interests in the Estate.

"And as far as our brother [Carlos, Jr.] being the Administrator of the Estate, which all three of us had agreed, we could all three be Administrators of the Estate. And we told him that we were satisfied with the fact that Carl was to administer the Estate, and that he lived here in the City of Walla Walla and my father had died in Walla Walla.

"And Mr. Roberts further stated, as the conversation wore on, in that he was familiar with it, with my father's accounts and had handled them, and produced a file containing Income Tax Statements, et cetera  .  .  .  and Mr. Roberts told us that with him representing my sister and myself in the case, he could work along quite well with Mr. Taggart, and advised us that there would be no extra Attorney's fee, in that he could split the fee with Mr. Taggart."

The testimony of Carlos Gregory, Jr., substantiates that of his brother. It appears from his testimony that respondent stated to them: (1) that he probably had more knowledge of decedent's affairs than any other man in Walla Walla; (2) that he had special information relating to decedent's affairs as it appeared in the income tax file; (3) that

he could work with Mr. Taggart as attorney for the estate without an additional fee; (4) that the three children could all be administrators of the estate, although two of them were nonresidents of the state; and (5) that he could represent the two nonresident heirs because

". . . my sister Blanche and brother Claude would probably feel safer and more at ease in their own mind that they would be fairly treated if he were representing them."

In addition, he testified that respondent stated to them:

" 'Some of these young lawyers are not so experienced as they think they are,' or words to that effect."

Mrs. Blanche Farnham was ill and could not testify.

Much of respondent's testimony supports the testimony of the Gregory brothers. Rather than attempt to paraphrase it, we set forth verbatim excerpts.

"As a matter of fact at that time I really considered that somehow in the deal I would be working with Murray Taggart, furnishing him information, not necessarily as Attorney for the Estate, but I considered Murray Taggart my friend.

. . .

"Oh, in the conversation, because I think that somewhere along the line I stated, 'Well, you people that live, either who live over in Idaho or Claude, who live in Oregon, at any time you don't think that you are being properly treated or protected, I'll be glad to represent you here.'

. . .

"I told them that any time if they didn't think—well, I might have used 'full confidence' in Mr. Taggart, that I would be glad to represent their interests locally.

. . .

"You see you have got to put its context with the rest of the statement, and when the questions were being asked I definitely gave the idea that if any time they figured they weren't getting a square deal on the deal, that I would be glad to represent them here, look after it and make sure that they felt that they were.

. . .

"Q. You knew that they were contemplating employing Taggart, isn't that a fact, if they hadn't already done so. You knew that they had it in mind? A. I think that's

right because I told them I would be glad—I told them I would be glad to work with Murray Taggart to help in any way that I could to get the thing done; *that they all had equal rights.*" (Italics ours.)

Respondent attempts justification of his action because of the alleged emergent importance of decedent's affairs, known to him, and because of his assumption that Mr. Taggart could not possibly have been employed as attorney for the estate at the time the heirs were in his office.

The record discloses no information of decedent's affairs, within the knowledge of respondent, other than that found in the file containing the income tax returns. We have examined the contents of the file. Its importance has been overemphasized. It contains no information helpful in making an inventory of the assets of the estate and nothing indispensable to its probation. In fact, the estate was probated without the help of any information obtained from it.

During probation of the estate, the estate accountant asked respondent for information concerning decedent's 1950 and 1951 Federal income tax returns. Respondent refused to give it to him. The information was secured from the internal revenue department.

Respondent testified that he refused the information because this disciplinary action was pending and the file was needed as an exhibit. Respondent's reason for refusal does not impress us. The information could have been given orally or copies could have been furnished.

Good taste and recognized custom of the bar indicate that the information contained in decedent's tax file be offered to the one to whom possession of such information might be useful. The observance of such a custom is one of the considerations which establish the practice of law as a profession, rather than a business. We attach no derogatory significance to respondent's act of telephoning Mrs. Farnham and disclosing the existence of the tax file, even though the information was not of an emergent nature. However, subsequent developments went too far. The record discloses nothing which would justify respondent's attempt

to plant the seed of doubt and suspicion between the non-resident heirs and the resident heir selected by them to be the administrator. It had but one purpose: the solicitation of business.

■ The record supports the conclusion that respondent solicited professional employment through personal communications and interviews, not warranted by personal or professional relations, in violation of Canon of Ethics 27.

Respondent's second contention—that Mr. Taggart could not possibly have been employed as attorney for the estate at the time the heirs were in his office, hence, he did not encroach upon the professional employment of another lawyer—is a *non sequitur*.

"One of the amenities which, over many years, lawyers have recognized toward one another, is the obligation to refrain from deliberately stealing each other's clients. This, as well as the obligation not to advertise and solicit, it is impossible to define precisely. As we approach the border-line between what is generally considered proper and what is improper, the question, as in the case of many other problems of professional ethics and etiquette, becomes one of good taste." Drinker, Legal Ethics, 190.

■ It is immaterial whether an actual contract for employment had been consummated between Mr. Taggart and the heirs. Respondent had been informed previously that Mr. Taggart "was looking after Estate affairs." Mr. Taggart had telephoned respondent to inquire whether he had any knowledge of decedent's will. At the conference it was confirmed that the heirs had consulted Mr. Taggart.

Under these circumstances, respondent's actions were just as much an encroachment upon the prospective professional employment of a lawyer so identified as they would have been had the contract of employment been an accomplished fact. Both situations are a breach of Canon of Ethics 7.

The record brings to our attention two additional matters which require mention.

■ Respondent filed an amendment to his answer to the complaint of the state bar association. In it he alleges:

"That it appears that Murray Taggart has attempted to work a 'badger game' on me in this matter in making his Complaint."

June 25, 1953, while this matter was pending before the bar association, respondent wrote its counsel as follows:

"For your information and so that the officials of the Washington State Bar Association *may appraise the character* of Murray Taggart, the prosecuting attorney of Walla Walla County, I enclose herewith a page from last night's paper on which appears a statement from attorney Arthur Hawman. Please associate this clipping with your file covering Mr. Taggart's complaint against me." (Italics ours.)

Mr. Taggart's character is not in issue; respondent's allegation and his act of sending the newspaper clipping are beyond the bounds of acceptable professional conduct.

The trial committee and the board of governors recommended that respondent be suspended from the practice of law for a period of thirty days.

In *In re Little*, 40 Wn. (2d) 421, 431, 244 P. (2d) 255 (1952), we said:

"The final adjudication should provide neither more nor less than the facts fairly require to penalize the offender, deter others, and indicate to laymen and members of the bar that proper discipline will be enforced and the standards of the profession maintained."

An examination of our former opinions discloses that there is no fixed standard by which the result of a disciplinary proceeding can be determined. Each case stands upon its own peculiar facts.

In *In re Steinberg*, 44 Wn. (2d) 707, 269 P. (2d) 970 (1954), the respondent was suspended for a period of sixty days for a violation of Canon of Professional Ethics 27. He had been reprimanded previously for a breach of the same canon. His actions, however, did not encroach upon the professional employment of another lawyer.

We are of the opinion that the recommendation of the committee and the board is within the quoted rule announced in the *Little* case, *supra*, and, in view of the fac-

tual difference, is consistent with the reasoning and result of the *Steinberg* case, *supra*.

It is the order of this court that respondent be suspended from the practice of law for a period of thirty days, commencing on the date this decision becomes final.

ALL CONCUR.