[No. C. D. 3686.   *En Banc.*   January 24, 1952.]

In the matter of the Proceedings for the Discipline of
H. E. FOSTER, *an Attorney at Law.*[1]

[1]Reported in 239 P. (2d) 1060.

*A. Vernon Stoneman,* for board of governors.

*H. E. Foster, pro se.*

DONWORTH, J.—During the month of May, 1950, the Washington state bar association, after investigation, charged Howard E. Foster, a member of the bar of this state since January 23, 1901, respondent herein, with violation of his duties as an attorney at law, the complaint alleging that:

In the month of August, 1945, Roy F. Arnold, who had been convicted of a felony and was then confined in the Washington state penitentiary at Walla Walla, employed respondent to institute a *habeas corpus* proceeding on his behalf. Arnold, upon the security of some leather articles which he owned, borrowed six hundred dollars from Norman J. Sanford, who turned the money over to respondent, who, upon receipt of this money, signed the following receipt (exhibit A in the trial):

"RECEIPT        Date     Aug 18 1945    17992
"Received from:         Norman J. Sanford
"Address              Walla Walla
"Six Hundred           Dollars ($600.00)
"For     for Roy F. Arnold—18159
                       [Signed] H. E. Foster"

Thereafter, respondent signed and delivered to Arnold a writing reading as follows (exhibit B in the trial):

"September 1, 1945
"I, H. E. Foster, consel [sic] for Roy F. Arnold, (WSP No. 18159) inmate of the Washington State Penitentiary, agree, that my fee in his case is to be $50.00 for expenses, $250.00 retainer, plus $250.00 which is to be paid to me when I obtain the release of Roy F. Arnold. The $250.00 is to be held in escroe [sic].

                      [Signed] H. E. Foster"

During January, 1946, while Arnold was still confined in the penitentiary, he discharged respondent, thereafter de-

manding from him the return of two hundred fifty dollars, with which demand respondent had never complied. (Three letters written by respondent to Arnold were set forth in the complaint, the last bearing date December 12, 1945, in which respondent advised Arnold that the hearing on the application for a writ of *habeas corpus*, which respondent had filed on Arnold's behalf, had been continued to January 31, 1946.)

The complaint continued by alleging that, by his failure to return the two hundred fifty dollars as requested by Arnold, respondent had violated his oath and duties as an attorney and the canons of professional ethics, concluding with this allegation:

" . . . that by his actions set forth above, the respondent Foster violated his oath and duties as an attorney and the Canons of Professional Ethics and particularly that portion of Canon Eleven reading as follows:

" 'Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him.'; and Canon Twelve, reading in part:

" 'In fixing fees, lawyers should avoid charges which over-estimate their advice and services. . . . .'.' "

The complaint contained a second count, based upon the letters above referred to, but, the trial committee having disregarded this count, it is not necessary to refer to it.

Respondent answered the complaint, paragraph I of his answer reading as follows:

"The following is inaccurate—in the first paragraph— 'Arnold upon the security of some leather wallets which he owned, arranged to borrow $600.00 from Norman J. Sanford'. 'Thereafter and on September 1, 1945, the respondent Foster signed and delivered to Arnold a document setting forth the terms of his employment and compensation as follows.' Also commencing on line 8 of page two of the complaint and ending with line 13 on said page

"Respondent denies that at any time did he violate his oath and duties as an attorney for the said Arnold, or any other person."

By way of a further answer to the complaint, respondent alleged that, early in August, 1945, at Sanford's request he examined the record of Arnold's trial before the superior court for King county, which resulted in Arnold's conviction and sentence to life imprisonment as an habitual criminal. Respondent advised Sanford that, in his opinion, Arnold's conviction "was not regular," and on August 18, 1945, he conferred with Arnold and Sanford at the penitentiary, informing Arnold

". . . that the effort to release him on habeas corpus would cost $600.00; and $100.00 would be for expenses and $500.00 for my fees. There were no conditions about the employment, except Arnold was then and there advised if an appeal was taken he would be compelled to pay the costs on appeal, printing of the brief the transcript, etc. All was agreed upon and I was directed to proceed. Mr. Sanford paid me $600.00 and I gave him a receipt for the same as the same appears in the complaint. . . ."

Respondent further alleged that Arnold stated he was anxious to be released from confinement because he had valuable property in Spokane county which he feared he would lose, and he wished respondent to attend to that matter. Because of the considerable lapse of time since his talk with Arnold and because he had no further connection with the matter, respondent had forgotten many of the details in connection therewith, his answer continuing:

"I forgot much of the deraigned matter as I supposed all was ended when I was not employed. I advised Mr. Arnold at that time I would have to make a trip to Spokane, and if he was accurate in his statements such services would cost him $500.00 for fees and expense of the trip to Spokane. That $50.00 would be necessary for the trip to Spokane. Arnold agreed to all this and said on my return to Walla Walla with the habeas corpus papers he would have the $50.00 for the expense. . . ."

By his answer, respondent further alleged that September 1, 1945, respondent again visited Walla Walla, when Arnold signed the petition for *habeas corpus* which respondent thereafter filed in the office of the clerk of this court, the petition having been thereafter referred to the superior

court for King county, where the matter was duly set for hearing, and that respondent "did everything that could be done before Arnold sent a message to the superior court he wished nothing further done in the matter." It appears that the hearing on the petition for *habeas corpus* was several times continued, finally being fixed for January 31, 1946.

By his answer, respondent stated that, if the board of governors believe that "something might be due Arnold," he would deposit with the board five hundred dollars or any other sum the board might name to cover "any judgment he may recover against me," and that, if the board should be of the opinion that respondent had received funds that should be returned to Arnold, he would immediately turn over to the board any "sum so found not properly belonging to me."

A hearing on the charges was held before a trial committee composed of Clarence J. Coleman, Chairman, George V. Powell, and Julian O. Matthews. The hearing opened June 22, 1950, the board being represented by A. V. Stoneman, counsel for the bar association, and respondent appearing *pro se.* At the end of the session, the committee recessed and met again July 28, 1950, respondent being present. During the time the committee was in recess, a supplemental complaint was filed by counsel for the bar association, charging Mr. Foster with the crime of perjury, committed in the course of his testimony before the committee. This matter is discussed *infra.*

Arnold and respondent were the only witnesses who testified before the trial committee.

Arnold, who had been released from confinement during the year 1949, testified that he had been four times convicted of crimes amounting to felonies in the state of Washington and elsewhere, his last conviction having been in this state during the year 1939, when he was sentenced to life imprisonment pursuant to the habitual criminal statute; that he first met respondent at the state penitentiary at Walla Walla August 18, 1945, when another inmate, one Sanford, who was a client of respondent and a friend of Arnold's, had recommended respondent to Arnold as a lawyer who could assist

him in obtaining his release from the penitentiary by way of a writ of *habeas corpus*. Respondent, who was in Walla Walla on legal business, called at the penitentiary and, at the suggestion of Sanford, asked to see Arnold, who was brought to the reception room under guard. Evidently Sanford was present at this meeting, which resulted in Arnold's retaining respondent to attempt to procure his release from the penitentiary by way of a writ of *habeas corpus*.

At this meeting, Sanford delivered to respondent six hundred dollars on Arnold's account, for which respondent signed a receipt dated August 18, 1945, hereinabove quoted.

Arnold's testimony regarding this transaction was:

"Q. What discussion did you have with Mr. Foster, at that time? A. I explained my case to him and he said, 'I will have you out in 30 days at the longest.' Q. What kind of a proceeding was he to commence, do you know? A. A writ of habeas corpus. Q. What was said about fees, at that time? A. Well, he wanted $50 for a retainer. It was to be $250,—$50 for expenses and $250 as a retainer. Q. Did you have the money, at that time? A. No, I didn't. Q. Where did you get the money? A. I pawned 315 wallets and borrowed $350 on 315 wallets. Q. From whom? A. Norman J. Sanford. Q. Was that money paid to Mr. Foster? A. Right. Q. Did you receive a receipt from Mr. Foster? A. I did. Q. (By Mr. Stoneman) Showing you Association's Exhibit A, I will ask you if this is a receipt from Mr. Foster for the $600? A. That is right."

Arnold further testified that he saw respondent a second time at the penitentiary September 1, 1945, when a convict who was acting as a clerk typed exhibit B, which respondent forthwith signed, Arnold retaining the document. The witness further testified that the difference in the amounts referred to in exhibits A and B is explained by the fact that there had been returned to Arnold fifty of the six hundred dollars to enable him to purchase leather with which to continue the manufacture of billfolds.

Respondent's testimony as to the two receipts was that he received the six hundred dollars from Sanford, signing therefor the receipt, exhibit A; that he met Arnold at the penitentiary, August 18, 1945, Sanford being present; that

after he was retained by Arnold in the *habeas corpus* matter, Arnold requested a private conversation with the respondent, which was arranged, and that Arnold then told him, as pleaded in respondent's answer, that he (Arnold) had valuable property in Spokane which was in jeopardy and that he desired respondent to investigate that situation; that respondent then told Arnold that his fee for investigating that matter would be five hundred dollars and that fifty dollars expense money would have to be paid before respondent would undertake this employment.

Respondent testified, referring to exhibit B, stating several times that this exhibit referred to his employment by Arnold in connection with the Spokane matter which he was to investigate on Arnold's behalf, and not to respondent's employment by Arnold in connection with the application for writ of *habeas corpus*

Respondent several times stated, as pleaded in his answer, that if the board of governors was of the opinion that respondent was in possession of funds which should be returned to Arnold, he would immediately deliver to the board any sum that the board found he should return. It does not appear that respondent ever deposited any sum whatever with the trial committee or the board of governors.

In rebuttal, Arnold testified that he had no property interests whatsoever in Spokane and that he never mentioned any such matter in his conversations with respondent.

At respondent's instance, there was admitted in evidence a copy of a letter dated January 27, 1946 (the copy not showing any signature), purportedly written to respondent by Arnold from the penitentiary, in which the writer advised respondent that he had decided to drop the "action pending." The letter further stated that the writer thought respondent should be satisfied with a fee of one hundred fifty dollars and would expect a check for the balance of the six hundred dollars "I paid you on August 18, 1945," by return mail. The return of his papers was also requested. The letter also stated that the writer had notified the clerk of

the superior court to drop the case. Respondent in his testimony denied ever receiving such a letter from Arnold.

The record does not support Arnold's claim, as stated in the letter, that respondent should return to him the sum of four hundred fifty dollars, but does clearly indicate that Arnold had exercised his right to terminate the relationship of attorney and client theretofore existing between the parties, and to claim from respondent, as the committee found, pursuant to exhibit B, *supra*, the return of two hundred fifty dollars.

Attached to this letter is a photostatic copy of a letter signed by Arnold bearing date January 27, 1946, directed to the clerk of the superior court for King county, instructing the clerk to strike from the calendar "the writ of habeas corpus action due to be heard on January 31, 1946 (No. 365993), Roy Arnold v. State." The letter also informed the clerk that the writer had notified his attorney, H. E. Foster, to the same effect.

The trial committee made its report, finding that respondent had signed the documents hereinabove referred to as exhibits A and B; that exhibit B was prepared at the penitentiary September 1, 1945, and was there signed by respondent and delivered to Arnold, the exhibit stating the agreement between respondent and Arnold concerning the former's employment for the purpose of instituting a *habeas corpus* proceeding on Arnold's behalf; and that Arnold, having become dissatisfied with respondent's services, on or about January 27, 1946, discharged respondent as his attorney and demanded return of the sum of two hundred fifty dollars, with which demand respondent declined to comply.

The committee's finding VIII reads as follows:

"The respondent is eight-two (82) years old, and has practiced law for approximately fifty-eight (58) years, forty-nine (49) of them in the State of Washington."

The committee's conclusions of fact I and II read as follows:

"From the foregoing, the Committee has reached the following conclusions:

"The instrument dated September 1, 1945, Association's Exhibit B, was prepared at the penitentiary at Walla Walla, Washington, on the date it bears; was signed by the respondent and delivered to Roy F. Arnold, and was the agreement between them pertaining to respondent's employment.

"The respondent was discharged by Arnold before obtaining Arnold's release from the penitentiary and therefore was obligated to return the $250 to Arnold. That Arnold made due demand on respondent, however, respondent refused to return said sum of $250 in accordance with the agreement and still has not returned the $250."

The committee recommended that respondent be suspended from the practice of law for three months.

The record was read and considered by each member of the board of governors and discussed by the board in conference. The board of governors voted unanimously that the findings and recommendations of the trial committee be approved and that respondent should be suspended from the practice of law for three months. The board of governors also directed that the entire record be submitted to this court.

Respondent filed exceptions to the report of the trial committee. The report of the trial committee, respondent's exceptions thereto, and the report and recommendations of the board of governors having been filed in the office of the clerk of this court, briefs were filed by the board of governors and by respondent, and the matter was twice argued before this court sitting *En Banc*, the board of governors appearing by its counsel and respondent *pro se.*

The trial committee was presented with an issue of fact, to wit, did exhibits A and B arise out of one transaction between Arnold and respondent or did they arise out of two different transactions between them? In determining this issue, the committee had to choose between the testimony of a four-times convicted felon and that of respondent. Having observed the demeanor of the two witnesses and heard them testify, it made findings substantially in accord with Arnold's testimony. Its findings were approved by the board of governors.

██    The rule which this court has applied under similar circumstances is well stated in *In re Thacker*, 35 Wn. (2d) 605, 214 P. (2d) 507, where we said:

"Some of the findings of the second trial committee were based upon sharply conflicting evidence. It is a very familiar rule that, when a judge of a trial court has made factual findings on conflicting evidence, a reviewing court will not ordinarily disturb them. That rule is logically based on the fact that the trial judge saw and heard the witnesses and heard and observed them give their testimony, and was, therefore, in a much better position to judge of their veracity and candor than the judges of a reviewing court, who see only a typewritten transcript of the evidence, can possibly be.

"That reasoning, of course, applies directly to the instant case. The trial committees were in a vastly better position to evaluate the testimony of the witnesses on both sides of the controversy than we can possibly be from a mere reading of the records, complete as they are.

"We will, therefore, accept the factual findings made by the second trial committee and adopted by the board of governors. Perhaps, the findings of a trial committee do not have the force of factual findings formally made by judges of a court; yet they are made by persons chosen to make them according to the rules established by the board of governors of the state bar in carrying out the legislative will and purpose declared in the Laws of 1933, chapter 94, p. 399, § 8."

See, also, *In re Dailey*, 37 Wn. (2d) 673, 225 P. (2d) 900.

██    On the basis of the facts as found by the trial committee and board of governors, there is no doubt that respondent was guilty of unprofessional conduct in violation of the Canons of Professional Ethics. When he was discharged as Arnold's attorney in the *habeas corpus* matter, he held two hundred fifty dollars of his client's money (being the part of the $550 which he had received under exhibit B which was to be held in escrow) to which he was not entitled under the terms of his agreement with his client. This two hundred fifty dollars was not payable until he had obtained the release of Arnold from the penitentiary.

When respondent received Arnold's letter of January 27, 1946, it was his duty to promptly reply thereto frankly ad-

vising his client as to his position in connection with the matter. Instead of writing to Arnold, who was, of course, then confined in the state penitentiary, he took advantage of his client's confinement, retained the money, and failed to take any steps toward accounting to his client.

This proceeding involves much more than a dispute between an attorney and his client as to the amount of a fee for services rendered. Here respondent, in spite of a written agreement as to his fee, ignored his client and wrongfully retained two hundred fifty dollars of his client's money which he held in trust until he obtained his release from the penitentiary. Such conduct on the part of an attorney cannot be condoned. When respondent was discharged as Arnold's attorney, he owed a duty to his client to account for funds of the client then in his possession.

Respondent's conduct was in direct violation of Canon of Professional Ethics No. 11, 34A Wn. (2d) 129, and, in our opinion, merits the discipline recommended by the trial committee and the board of governors.

Referring to the amendment to the complaint by which respondent was charged with perjury, the record shows that, at the first hearing before the trial committee (June 22, 1950), respondent testified that the receipt dated September 1, 1945, was a carbon copy of an original typed in his office on his letterhead and that in some way it had gotten out of his files in a manner unknown to him. A committee member called respondent's attention to the fact that this receipt did not appear to be a carbon copy at all but an original instrument. Respondent insisted that it was a carbon copy, that the original was on his letterhead and had been typed in his office.

Counsel for the bar association then moved for permission to amend the complaint to charge respondent with perjury in that he had testified before the committee under oath that this receipt was typed in his office and was a carbon copy, whereas, in truth and in fact it was typed in the ward room at the penitentiary in Walla Walla. This amendment was allowed and a continuance was granted to July 28, 1950, to present proof thereof.

Meanwhile, on June 30, 1950, respondent wrote to the chairman of the committee as follows:

"Since the hearing in my matter, I have examined day book of transactions of August, 1945 and find no mention of the paper, and am satisfied I was in error about the same being made in this office; also the composition is not mine. The paper not stating where it was made, the paper being the same as office copies and signed with led pencile, led me to believe it was made here, but I am now satisfied I do not know where it was made or who made it."

At the adjourned meeting (July 28, 1950), the amendment charging respondent with first degree perjury was served upon him. He then resumed the stand and admitted writing the letter of June 30, 1950, to the chairman. Respondent then asked for a continuance to meet this charge, which was granted by the committee. He, however, voluntarily withdrew his motion for a continuance, and the hearing was closed.

The trial committee adopted conclusion IV relative to this charge, reading as follows:

"The respondent's testimony that Association's Exhibit B was a carbon copy of an original typed in his office was false and at the time of such testimony, he knew the same to be false."

We do not approve this conclusion, which amounts to finding respondent guilty of first degree perjury, which is a felony upon the conviction of which a perjurer is subject to a long term of penal servitude.

In Rem. Rev. Stat., § 2351 [P.P.C. § 118-1], the gist of the offense is defined as stating under oath in any hearing or investigation as true any material matter which the affiant knows to be false.

What respondent did in this proceeding was to swear that the receipt, dated September 1, 1945, was a carbon copy prepared in his office. This document shows on its face that it is a ribbon copy and not a carbon copy.

Within ten days after the close of the first hearing, respondent voluntarily wrote to the chairman of the committee in effect retracting his statement and stating that

"I am now satisfied I do not know where it [the receipt] was made or who made it." This letter was written about a month before the adjourned hearing and before the committee considered its findings and recommendations.

Under these circumstances, considering the gravity of the charge, we are of the opinion that the evidence does not support the trial committee's conclusion. As we view the record relative to this amendment to the complaint, the facts are as consistent with respondent's having been honestly mistaken as with the opposite conclusion.

The recommendation of the trial committee, which was approved by the board of governors, reads as follows:

"The respondent's conduct in this case would normally merit a much heavier penalty than the Committee is recommending. A number of factors, however, have influnced the Committee in the recommendation it is making, and including among them are the following: (1) the respondent's age; (2) his offer to refund the $250 due Arnold; and (3) the admissions made in his letter to the Chairman of the Trial Committee (Association's Exhibit J) thus saving the Association from the expense and trouble of producing the proof. The factor weighing most heavily was his age. Notwithstanding his advanced age, however, the Committee cannot condone false statements under oath in any form and feels some suspension is necessary. In view of all the factors, this Committee recommends that the respondent be suspended from the practice of law for three (3) months."

■ While, for the reasons stated above, we disapprove of the finding that respondent was guilty of first degree perjury, we are in accord with the recommendation that respondent be suspended from the practice of law for three months.

His violation of Canon of Ethics No. 11, by ignoring his client's claim for the two hundred fifty dollars for more than four years and by failing to account for this money, merits the suspension recommended by the board.

We, therefore, approve that portion of the board's recommendation relative to suspension, and it is accordingly ordered that Howard E. Foster be suspended from the practice of law in the state of Washington for a period of

three months, this period of suspension to commence thirty days after the filing of this opinion.

SCHWELLENBACH, C. J., MALLERY, HAMLEY, FINLEY, and WEAVER, JJ., concur.

HILL, J., concurs in the result.

GRADY, J. (dissenting)—I am not in accord with the majority opinion. The only testimony upon which a finding of unprofessional conduct can be based comes from a four-time loser in the criminal courts, and who was sentenced to the penitentiary as an habitual criminal. His specialty was that of armed robbery. There is nothing in the record to indicate that respondent is other than a reputable member of the bar of this state of many years standing. The hearing was had approximately five years after the transactions occurred upon which this proceeding is based. The transactions were of such a character it should cause no surprise that the respondent was able to remember some of the occurrences better than others. I accept the testimony of respondent in preference to that of the complaining witness.

Norman J. Sanford and Roy F. Arnold were inmates of the state penitentiary. Respondent had transacted some business for Sanford, and through him came in contact with Arnold. Respondent was employed to sue out a writ of *habeas corpus* challenging the validity of Arnold's incarceration in the penitentiary. Realizing the character of the people he was dealing with, respondent requested that his attorney's fee and expenses be paid in advance. Arnold was without funds, but had some leather wallets which he had manufactured, and proposed that if Sanford would advance the money he would send the leather goods to respondent to hold as security. Sanford paid respondent the sum of six hundred dollars. Arnold then desired to have a private conference with respondent, and Sanford absented himself. Arnold informed respondent that he had some property interests in Spokane and wished to employ an attorney to look after them for him. The whole matter was very vague, and of such a character that respondent prudently requested that financial arrangements be made for a

preliminary investigation and for his fees. An inmate was available who could operate a typewriter, and the document of September 1, 1945, was typed by him. It does not appear that any of the money called for by this document was ever paid to respondent or that he ever did anything further. The leather goods were sent to respondent, but he did not open the packages. Later he was directed to send them to a party whose name he did not recall, and complied with the request. Sanford located some of the goods and applied what he realized upon the sale of them to the indebtedness Arnold owed him.

It is clear from the testimony of respondent that the receipt of August 18, 1945, and the agreement of September 1, 1945, refer to two separate and distinct transactions and have no relation to each other whatsoever. The instruments were prepared at different times and by different persons. The one relating to the *habeas corpus* matter is a receipt for six hundred dollars representing the amount of money advanced by Sanford for the benefit of Arnold. It appears to be in the handwriting of respondent. The instrument relating to the Spokane matter is an agreement between Arnold and respondent that his fee for legal services in that case would be five hundred dollars, plus the sum of fifty dollars for expenses. It contemplates that two hundred fifty dollars should be paid as a retainer fee. The other two hundred fifty dollars was to be held as an escrow and paid to respondent when Arnold was released from the penitentiary. I do not see how any other conclusion can be reached than that the time of payment fixed was when Arnold was released on the successful termination of the *habeas corpus* proceeding.

Respondent instituted the *habeas corpus* proceeding, but there was much delay in getting a trial date fixed at which he could appear. Arnold became impatient and directed that the *habeas corpus* proceeding be dismissed. Although respondent was of the opinion that he was not legally or morally bound to return any of the money advanced by Sanford for Arnold, he informed the trial committee that

if its members felt that he should do so he would accept their advice and act accordingly.

The hearing before the trial committee was first conducted upon the theory that the two instruments related to the *habeas corpus* proceeding, and inasmuch as respondent was discharged by his client before his services were completed, it was unethical for him to retain two hundred fifty dollars of the money he had received from Sanford. During the progress of the hearing, the document prepared by the inmate at the penitentiary was exhibited to respondent. At that time, respondent had forgotten that the transaction indicated thereby had occurred. Nothing had been done by respondent with reference to the Spokane transaction. A period of five years had elapsed. When respondent saw the document, he recognized his signature. He became quite confused. Instead of asking for time to examine the document and refresh his recollection, he endeavored to reconstruct the matter to which it referred. He assumed that he must have drawn the instrument and the document shown him was a carbon copy thereof. It apparently did not occur to him that by reason of the misspelled words and the style of writing it was not one he would prepare. He assumed that the original must have been written on one of his letterheads. He did not recall of ever having delivered the document to Arnold. He further concluded that the carbon copy must have been taken from his files unknown to him and have gotten into the possession of Arnold. It evidently appeared to the trial committee that respondent was not telling the truth when he claimed the document related to a transaction different from the *habeas corpus* proceeding and that it was a carbon copy of an instrument he had prepared. Respondent was questioned closely by a member of the committee, as well as its counsel, and became quite positive of his assertions. It seems to me under all of the circumstances the trial committee should have realized respondent was laboring under a mistake rather than wilfully falsifying, and might well have taken time to investigate rather than having the complaint amended to charge per-

jury. Later, when respondent had an opportunity to check his files and refresh his recollection, he concluded he was mistaken in his testimony and so advised the trial committee. A later hearing was had on the perjury charge. Findings and recommendations were made as set forth in the majority opinion.

I am in accord with the views expressed in the majority opinion that the charge of perjury was not sustained and that it should have been dismissed. I prefer to accept the testimony of respondent to the effect that he had two separate and distinct employments—one with reference to *habeas corpus*, and another relating to the Spokane matter—rather than that of Arnold. I am satisfied respondent was honestly mistaken when he testified with reference to exhibit "B," and think the trial committee should have accepted his later explanation when he had an opportunity to refresh his recollection from his files.

The respondent was not permitted by his client to complete the *habeas corpus* proceeding. Nothing was paid on the Spokane transaction and no services were performed. Notwithstanding this, respondent offered to return to Arnold two hundred fifty dollars of what he had received on the *habeas corpus* employment if the trial committee felt there should be a refund. This offer was not accepted.

I am unable to agree with any finding that respondent has received any money from either Sanford or Arnold which he should return or refund, or that he has been guilty of any unethical conduct in his transactions with either of them.

The proceedings should be dismissed.