[No. C. D. 1082.　*En Banc.*　March 27, 1962.]

*In the Matter of the Disciplinary Proceeding Against*
J. LAEL SIMMONS, *an Attorney at Law.*\*

\* Reported in 369 P. (2d) 947.

*T. M. Royce,* for Board of Governors.

*Wm. H. Simmons* and *Ralph B. Potts,* for respondent.

OTT, J.—June 6, 1960, J. Lael Simmons, an attorney at law, authorized to practice in Washington, was charged with conduct violative of his oath of attorney and certain Canons of Professional Ethics.

The complaint detailed factual allegations of specific acts of unprofessional conduct in his capacity as attorney for the guardianship estates of Frederick John Carroll and Laura F. Carroll, incompetent persons, for the estate of Laura F. Carroll, deceased, and for surreptitiously taking from the safe-deposit box of the guardian of these estates certain bonds of a cash value in excess of $4,000, appropriating them to his use, and refusing to return them upon demand. The complaint prayed that J. Lael Simmons be disciplined as provided by law. RCW 2.48.220; Rules for Discipline of Attorneys 1 through 11, RCW Vol. 0.

J. Lael Simmons' answer denied the alleged unprofessional conduct or that he had violated his oath of attorney or the Canons of Professional Ethics, and prayed that the complaint be dismissed.

August 16, 1960, the cause was heard before a trial committee. J. Lael Simmons appeared in person and with his

counsel, Ralph B. Potts. The Washington State Bar Association was represented by its attorney, T. M. Royce. From the voluminous evidence adduced, the trial committee entered its formal findings of fact, which were filed with the Board of Governors on October 6, 1960, and therein recommended "That Mr. J. Lael Simmons should be reprimanded."

The Board of Governors, in accordance with Rule for Discipline of Attorneys 8, RCW Vol. 0, reviewed the record and, on September 7, 1961, entered its findings of fact, conclusions, and recommendation as follows:

"The Trial Committee heard all of the testimony offered and received numerous exhibits and caused the proceedings to be reported by a duly licensed court reporter of Seattle. After completion of the hearing and after studying the exhibits and deliberating upon the testimony and evidence which had been introduced, the Trial Committee made and filed with the Board of Governors of said State Bar Association their findings of fact and recommendation.

"Each member of the Board of Governors has separately studied the record of the proceedings, including the transcript of the evidence introduced before the Trial Committee, and at a meeting on August 17, 1961, at which all members of the Board were present (excepting James Leavy, who took no part in the review), the Board of Governors made the following findings of fact and recommendation:

"FINDINGS OF FACT.

"(1) On June 30, 1927, J. Lael Simmons was admitted to practice law by the Supreme Court of the State of Washington, and at all times since the effective date of the Washington State Bar Act in 1933 he has been and now is a member of the Washington State Bar Association, and at all times herein mentioned he has resided and now resides and practices law in King County, Washington.

"(2) In December, 1948, Mr. Simmons was employed by Laura F. Carroll to act as attorney for herself and Frederick J. Carroll, her husband, in the prosecution of a claim against Edith N. Gordon for injuries received by Mr. Carroll in an accident which occurred on November 23, 1948; Mr. Carroll's injuries in said accident were such that he was never mentally competent subsequent to the accident; this employment was the first time Mr. Simmons had known Mr. and Mrs. Carroll; at the time of the accident, Mr. Carroll was an employee of Tyee Lumber and Manufac-

turing Co., and Mr. Simmons was at that time and had for several years been attorney for said company.

"(3) In February, 1949, Mr. Simmons was employed by Laura F. Carroll to act as her attorney on her petition for the appointment of Mrs. Martha Ulrich as guardian of the person and estate of Frederick John Carroll, an incompetent; at said time, Mrs. Carroll did not feel able to undertake the duties of a guardian and asked that her friend and neighbor, Mrs. Ulrich, be appointed. On March 15, 1949, Mrs. Ulrich was appointed guardian of the person and estate of Mr. Carroll; Mrs. Ulrich qualified as guardian and at all times material hereto was the duly qualified and acting guardian of the person and estate of Frederick John Carroll, an incompetent, in Proceedings No. 110297 of the Superior Court for King County, Washington. During all such times until January 9, 1957, when, by order of Court, other attorneys were substituted, Mr. Simmons was attorney for Martha Ulrich, as such guardian.

"(4) On April 11, 1949, Frederick John Carroll was adjudged to be mentally ill, and he was ordered to be confined in the Western State Hospital; at all times since then, he has been and now is so confined.

"(5) On April 15, 1949, Mr. Simmons telephoned the home of the guardian, Martha Ulrich, and talked to her daughter, Marianne, who was then fifteen years of age, requesting her to bring Laura Carroll to his office, together with the pass book that Mrs. Carroll had for the Washington Mutual Savings Bank; that Mrs. Ulrich was in Port Angeles, Washington, at said time; that Marianne Ulrich, now Marianne Bergene, got Mrs. Carroll, as requested, and went with Mrs. Carroll, who brought her pass book as requested to the office of Mr. Simmons; that Mr. Simmons went with Marianne and Mrs. Carroll to the said bank, and Mrs. Carroll then withdrew $5,000.00 from account No. 42727, which was in the name of Fred Carroll or Laura Carroll; that immediately thereafter, Marianne, Mrs. Carroll and Mr. Simmons went to the United States post office at Third and Union Streets in Seattle where Mrs. Carroll purchased United States Series 'E' Savings Bonds of a total face value of $6,650.00; said bonds were issued and registered in the name of Mrs. Laura F. Carroll, payable on death to J. Lael Simmons, without the knowledge or consent of Frederick John Carroll or his guardian, Mrs. Martha Ulrich; Mr. Simmons at that time took the bonds into his possession and returned to his office with them, Mrs. Carroll and Marianne then leaving.

"(6) In May, 1949, Mr. Simmons telephoned to Mrs. Ulrich and asked her to bring Laura F. Carroll to his office to take the bonds to her safety deposit box. Mrs. Ulrich and Mrs. Carroll went to Mr. Simmons' office and he sent his secretary with them to the Seattle First National Bank, Main Office, where the bonds were placed in a safety deposit box.

"(7) On December 26, 1950, Mrs. Ulrich was appointed guardian of the person and estate of Mrs. Carroll, a mentally incompetent person, and Mr. Simmons acted as her attorney and continued to so act until the Court ordered a substitution of attorneys on January 9, 1957.

"(8) On December 11, 1951, the contents of the safety deposit box in the Seattle First National Bank were transferred by Mr. Simmons and Mrs. Ulrich to a safety deposit box in The National Bank of Commerce for the only expressed reason that this bank was more conveniently located; that at said time the box was placed in the name of J. Lael Simmons or Mrs. Martha Ulrich, enabling either one to have access to the box.

"(9) On December 22, 1952, Mrs. Ulrich removed three $500.00 face value bonds from the safety deposit box, which were cashed and the proceeds used for the benefit of Mrs. Carroll, and subsequently a $500.00 face value bond was also so used.

"(10) No inventory was filed in either of the two guardianships until December of 1952, at which time inventories were filed in both guardianships; that the bonds hereinabove referred to as having been purchased by Mrs. Carroll and subsequently placed in a safety deposit box were not inventoried in the guardianship of Frederick Carroll but were inventoried in the guardianship of Laura Carroll; that Mr. Simmons asserted that he believed these bonds, and the bank account which furnished the source of money to purchase the bonds, were the separate property of Mrs. Carroll since she had told him that she had a bank account that 'not even Fred knows about'; that Mr. Simmons made no independent investigation to ascertain whether said bonds were properly community or separate property.

"(11) On June 13, 1954, Laura F. Carroll died and probate of her estate was started, with Mrs. Ulrich as administratrix with the will annexed, and Mr. Simmons as attorney for the estate, in August of 1954; that on June 28, 1954, Mr. Simmons entered the safety deposit box hereinabove referred to and removed the contents thereof; that he there-

upon delivered all of the contents, except the bonds, to his associate, Mr. Yates, to handle the detail work of the probate, and he kept the bonds in his possession, subsequently having the bonds changed to his own name; that Mr. Yates, when testifying before the Trial Committee, could not recall any discussion with anyone about these bonds, and the bonds were not inventoried in the probate; the inventory in the estate was filed in November of 1954.

"(12) The savings bonds taken by Mr. Simmons from said safety deposit box, at said time, had a face value of $4,650.00; Mrs. Ulrich was not informed of the removal of the contents of the box and did not know of this until she went to the safety deposit box in February of 1955 and found it empty.

"(13) Mr. Simmons remained as attorney for the estate of Mrs. Laura Carroll until removed by Court order on January 9, 1957.

"(14) After Mrs. Ulrich found the safety deposit box to be empty in February of 1955, she recalled a 1954 discussion with Mr. Simmons, in which he had asserted his ownership of the bonds; shortly thereafter, Mrs. Ulrich consulted the firm of Ryan, Askren & Mathewson and Mr. William Shaw of their office handled the matter for Mrs. Ulrich, although she first talked to Snyder Jed King of their office; Mrs. Ulrich then stated a concern over her liability for failure to inventory the bonds; Mrs. Ulrich went to Europe in June, 1955, and returned in March, 1956; in April of 1956, Mr. William Shaw prepared a petition for the removal of Mr. Simmons as attorney in the guardianships and in the probate, which Mrs. Ulrich signed; in April of 1956, Mr. Simmons learned of this and went to the home of Mrs. Ulrich to discuss the matter with her; at that time he represented to and convinced Mrs. Ulrich that he and Mr. King were good friends and that everything could be straightened out and Ryan, Askren & Mathewson would 'drop the matter' if they were paid a reasonable fee for their services to that date; Mr. Simmons prepared a letter for Mrs. Ulrich to approve, dated April 23, 1956, (Exhibit No. 3) addressed to Ryan, Askren & Mathewson, which stated in part that Mrs. Ulrich recognized an obligation to them for advice and had requested him to inquire as to the amount of their fee; said letter further stated that she would arrange for payment; Mr. Simmons secured the approval of Martha Ulrich to said letter on the basis of representations to her which led her to believe that this procedure had been approved by telephone conversation between Mr.

Simmons and attorneys in the office of Ryan, Askren & Mathewson; there had been no such conversation of any kind or character.

"(15) That thereafter, the office of Ryan, Askren & Mathewson contacted Mrs. Ulrich and stated that they had made no arrangements of any kind with Mr. Simmons; that as a result thereof, Mrs. Ulrich re-signed the petitions for the removal of Mr. Simmons and signed a letter, dated May 28, 1956, (Exhibit No. 4) authorizing Ryan, Askren & Mathewson to proceed with the filing of said petitions.

"(16) Said petitions for the removal of Mr. Simmons were duly filed, and on June 6, 1957, Martha Ulrich as administratrix with will annexed of the estate of Laura F. Carroll, deceased, and as guardian of the person and estate of Frederick John Carroll, incompetent, brought suit against Mr. Simmons in Cause No. 508348 of the Superior Court for King County for the recovery of the savings bonds taken by him from the said safety deposit box or for their proceeds.

"(17) On May 26, 1958, one day before the trial of said Cause No. 508348, Mr. Simmons offered to turn over to the plaintiff the bonds for which suit was brought, together with statutory costs; this offer of settlement was approved by the Court by order entered May 28, 1958, and pursuant thereto, Mr. Simmons paid to Mrs. Ulrich as guardian and administratrix $4,495.80. Mr. Simmons told the Trial Committee that he never liked this settlement of the case because he felt that the bonds were his, but he agreed to it on the advice of his lawyer, Mr. Paul Coughlin, who told him he should make it in order to avoid publicity and injury to his reputation and to avoid trouble with the Bar Association.

"(18) The attorneys for the guardian and administratrix were allowed by the Court in said proceeding and were paid a fee of $2,057.32 for their services; the guardian ad litem for Frederick John Carroll was allowed by the Court and was paid a fee of $50.00; costs were incurred and allowed by the Court and paid in the sum of $259.36; the net amount realized by the guardianship and decedent's estates was $2,129.12.

"(19) On the 15th day of April, 1949, when the bonds hereinabove referred to were purchased by Mrs. Carroll, she was so badly upset and in such a mental state that she was incompetent to handle her business affairs and to realize the effect of her business transactions.

"The undisputed evidence in this proceeding introduced

through neighbors and long-time acquaintances of Mrs. Carroll was to the effect that prior to the date of Mr. Carroll's injuries Mrs. Carroll was somewhat mentally confused and that following the accident her habits changed and her mental condition steadily worsened.

"(a) Mrs. Stella Vchulek testified (St. 81) she had known Mrs. Carroll since in 1937 and lived next door to her. Prior to Carroll's accident, Mrs. Carroll was very thrifty. She did all her own baking and kept her house clean; she loved money and would not even give her husband any spending money. She closed off part of the house to save on electric light and heat bills. Mr. Carroll on one occasion told the Vchuleks that Mrs. Carroll's mind was slipping badly and he inquired if they knew of a doctor who could help her. Following Carroll's accident, she permitted the house to become dirty, milk to collect and sour, and food to be scattered about the place.

"(b) Ada Moore testified (St. 95) that she had known the Carrolls for twenty years and had visited them along through the years. Mrs. Carroll was beginning to 'get wandering in her talk. She was not sensible like she had been through the years (St. 96)'. 'She got worse after he was sick (after the accident). She got so she really didn't know much. She was very, very childish (St. 97). Even before the accident, she was not able to take care of things'.

"(c) Marianne Bergene, daughter of Martha Ulrich, testified (St. 60) she had known the Carrolls since in 1941; that following Mr. Carroll's accident, Mrs. Carroll gradually became upset, did not remember things and had a hard time managing for herself. On occasions, the mother of this witness invited Mrs. Carroll to have dinner with the Ulrich family and told her they would eat around 5:00 o'clock. Mrs. Carroll would say, 'All right, I'll see you then', and would go home. When she did not come to the Ulrich home at the proper time the witness would go to her house and find that Mrs. Carroll had gone to bed. Mrs. Ulrich would accompany Mrs. Carroll to the hospital to visit Mr. Carroll. Upon returning home, Mrs. Carroll would ask Mrs. Ulrich to go with her to see him, and when Mrs. Ulrich would say, 'We just seen him', Mrs. Carroll would say, 'Oh, yes, that's right, Fred is dead'. 'Generally, she just seemed to have no idea what was going on.' She became filthy in and about her house after Mr. Carroll's accident and gradually became worse.

"(d) A long-time neighbor and close friend of the Carrolls, Martha Ulrich, testified (St. 5) that she was requested

to act as guardian for Mr. Carroll. She went with Mrs. Carroll to respondent's office and after respondent had conferred with them he suggested that Mrs. Ulrich act as guardian and stated to Mrs. Ulrich that 'Mrs. Carroll wouldn't know from one minute to the other what she's doing, if she's coming or going (St. 7)'. I told him, 'Yes, Mrs. Carroll is a sick woman.' Mrs. Carroll was a wonderful housekeeper but after the accident she was sick. She could not find her way to the hospital though she had gone there numerous times. For a month immediately following the accident Mrs. Carroll would set an extra place at the table saying, 'Fred is going to come home'. Mrs. Carroll was stingy with her money.

"(e) Mrs. Carroll's condition became so bad that the neighbors began complaining. On one occasion she walked down the street in her underclothes with a shawl for a wrap. She said she was going to get married and when Mrs. Ulrich told her she had a husband and couldn't get married, she told Mrs. Ulrich that Mrs. Ulrich wasn't going to tell her who she was going to marry. Mrs. Carroll did not know where or when she was born and Mrs. Ulrich had to search for her birth records. Mrs. Ulrich testified that Mrs. Carroll's condition got worse all of a sudden; she was sick and after the shock about her husband she got worse day by day (St. 58).

"(20) The deposition of Dr. Robert Whitcomb Brown, clinical director of the State of Washington at Western State Hospital, was taken and appears in the transcript beginning on page 198. This doctor testified that while his records showed that he knew Mrs. Carroll as early as July 11, 1949, he might have met her on another occasion as early as April 12, 1949. He met her when she came to the hospital to visit her husband, and at that time made an observation as to her mental condition. At no time did Mrs. Carroll appear to him to be mentally competent. His attention was attracted to her by her abnormalities.

"(21) As Mrs. Carroll's mental condition worsened, reports were made to respondent, and in the fall of 1950, he had Dr. Morton E. Bassan examine Mrs. Carroll. His written report of his examination, dated December 18, 1950, includes statements to the effect that she was then mentally confused, disoriented for time and person, vague, rambling, circumstantial in her speech, her memory for recent and remote events was markedly impaired, her capacity for clear and logical thinking was markedly impaired, and her judgment was very poor. The diagnosis established

is arterio-sclerotic disease of the brain, causing mental deterioration to the point of psychosis. He recommended that Mrs. Carroll be under constant care. His written report was admitted as Association's Exhibit No. 8.

"(22) Respondent, on March 15, 1949, knew of Mrs. Carroll's mental condition. He had met her a few times and suggested to Mrs. Ulrich that Mrs. Ulrich act as guardian for Mr. Carroll because Mrs. Carroll 'would not know from one minute to the other what she's doing, if she's coming or going'. Her mental condition was obvious to her friends and acquaintances and was or should have been obvious to her attorney. In carrying on negotiations for the adjustment of Carroll's claim for personal injuries, respondent informed Owen Hughes, attorney for the claimee, that there was some question as to Mrs. Carroll's competency (St. 90-91). This was less than two months after the purchase of the bonds.

"(23) Respondent testified before the Trial Committee (St. 142) that he had assured Mrs. Ulrich that if Mrs. Carroll was willing to petition the court for Mrs. Ulrich's appointment as guardian, he was certain the court would approve it. 'At this time Mrs. Carroll was still more or less in a state of shock. I was not impressed that she was any mental giant nor did I feel that she was incompetent except to earn a livelihood'.

"(24) Following the commitment of Mr. Carroll to Western State Hospital, Mrs. Ulrich, his guardian, was exhausted, and she went to Port Angeles with a friend for a visit and rest. There is some evidence in the record that respondent knew she was away from home at this time. He telephoned Marianne Bergene, then Marianne Ulrich and of the age of fifteen years, to get Mrs. Carroll and bring her to his office and to have Mrs. Carroll bring her bank book. Mrs. Carroll and Marianne then went to respondent's office and he then accompanied them to the bank, where Mrs. Carroll withdrew Five Thousand Dollars from Savings Account No. 42727, and the three of them then went to the post office where Mrs. Carroll purchased the bonds. Marianne's testimony was that when respondent telephoned her home he did not ask for her mother but simply directed his request to her, Marianne. Respondent admitted being at the post office but testified he had no recollection of going to the bank with Mrs. Carroll and Marianne on this occasion.

"(25) Respondent also represented that he understood the money in this savings account came as part of a prop-

ertly settlement in a divorce action which his client had had with a former husband. He testified that his client told him that Fred, her husband, did not even know about the account. The evidence clearly shows that the account had been established in 1934, many years prior to the time Mrs. Carroll became a client of respondent, and that it was a joint account of her and Mr. Carroll, with his name appearing on the account and on the signature identification card which accompanied the account record. On numerous occasions during the years after the account had first been established, moneys had been withdrawn therefrom and deposited therein. The account was established during the married life of Mr. and Mrs. Carroll and to all intents and purposes, on the face of the record, was the community property of these people. Mrs. Carroll had no legal right to make a gift of any substantial part thereof, all of which should have been—and undoubtedly was—known to respondent.

"(26) Respondent represents that he had advised his client that she should have the money invested where she would receive larger returns, and that he also advised her that she should make some disposition of the money other than leaving it in the savings fund because as Mr. Carroll and she had no children it would escheat to the state.

"(27) There is no reasonable explanation for such transaction or for the conduct of Mrs. Carroll, an ordinarily thrifty, stingy person, in making an almost complete stranger the beneficiary of this large block of bonds.

"(28) Respondent's ability to remember certain lesser details of his transactions with Mrs. Carroll and the Carroll family's business and inability to remember other details which were of greater importance in this proceeding fails to add to the weight of his testimony.

"From the foregoing findings, the Board makes the following,

"CONCLUSIONS.

"(1) Respondent, in performing the acts which he did in connection with the securing of these bonds, the acceptance thereof, and the appropriation thereof to his own personal use, violated his oath as an attorney, violated his duty to his clients, and abused the confidence which they had a right to place in him, and he overreached Mrs. Carroll in this transaction, and his acts involved moral turpitude, dishonesty or corruption, as outlined in Rule 10, Discipline of Attorneys, Washington Reports, Second Series, 34A, page

183, and Rule 1, Rules for Discipline of Attorneys, Wash. Dec., Volume 157, No. 2A, at page 32.

"(2) The conduct of respondent in representing to Mrs. Ulrich that he had conferred with Mr. King and that Mr. King and his legal firm would not sue him or do anything for her because King and he were good friends is subject to serious criticism. First, because it developed that such representations were false and that respondent had not even contacted Mr. King, and, second, because such representations tended to destroy faith in the legal profession and the Bar Association and to bring them into disrepute. He utterly failed to uphold the honor and to maintain the dignity of the profession, as required by Canon 29 of our Code of Professional Ethics.

"RECOMMENDATION.

"It is the recommendation of the Board of Governors that J. Lael Simmons be suspended from the practice of law for one year."

The findings of the trial committee and the Board of Governors from No. 1 through No. 18 are nearly identical. The remaining findings of the Board of Governors differ primarily in the matter of detail.

February 26, 1962, the cause was heard before this court. Rule for Discipline of Attorneys 9, RCW Vol. 0. Respondent, in his brief and in oral argument, contends:

(1) ". . . there is not a scintilla of evidence, in connection with this bond transaction, that Respondent acted in disregard of his professional responsibilities or duties or overreached his client in any manner."

To sustain this contention, respondent asserts that he did not know that the account from which Mrs. Carroll withdrew the funds with which to buy the bonds belonged to the community, because she had previously informed him that it was money her husband knew nothing about and had been received by her as a result of a previous marriage. In this regard, the evidence is in sharp conflict.

Marianne Bergene (formerly Marianne Ulrich) testified that, on April 15, 1949, respondent Simmons called her by telephone and asked her to bring Mrs. Carroll and Mrs. Carroll's Washington Mutual Savings Bank passbook to his office; that she took Mrs. Carroll (who had the passbook

with her) to his office; that respondent, Mrs. Carroll, and the witness went to the Washington Mutual Savings Bank where respondent and Mrs. Carroll went to the withdrawal window, and that, from the bank, they went to the post office where the bonds were purchased.

Respondent did not deny making the call or being with them at the Washington Mutual Savings Bank, but testified that he could not remember it. This telephone call to Marianne Ulrich (Bergene) and the trip to the bank are consistent with his testimony that he had advised Mrs. Carroll to withdraw the funds from savings and invest them in United States savings bonds to obtain a higher interest.

In disciplinary proceedings, our rules delegate to the trial committee the authority to determine the facts. The Board of Governors makes its findings of fact from the record of the trial committee. Rules for Discipline of Attorneys 5, 7, and 8, RCW Vol. 0. When the cause is heard before this court and the factual determinations are questioned by the respondent, we are in as good a position as the Board of Governors to determine the facts because we review the same record. We will give weight to the findings of the Board of Governors, but are not bound thereby. *In re Thacker*, 35 Wn. (2d) 605, 214 P. (2d) 507 (1950); *In re Dailey*, 37 Wn. (2d) 673, 225 P. (2d) 900 (1950); *In re Foster*, 40 Wn. (2d) 1, 239 P. (2d) 1060 (1952); *In re Case, ante* p. 181, 367 P. (2d) 121 (1961).

The record discloses that respondent knew or should have known these facts: That Frederick J. and Laura F. Carroll were husband and wife and, as such, had resided in King County for many years; that the only income the community had was the earnings of Frederick J. Carroll; that the Washington Mutual Savings Bank passbook No. 42727, which Mrs. Carroll brought to respondent's office, indicated a joint account in the names of "Fred Carroll or Laura Sigsworth Carroll"; that the entries were small monthly savings; that such an account is presumed to be community property; that the ward, Frederick J. Carroll, had an interest in the account; that, in his capacity as

attorney for the guardianship estate of Frederick J. Carroll, respondent's duty was to cause the account to be included in the inventory of the guardianship estate, to be withdrawn by the guardian only, when so authorized by court order.

April 15, 1949, the respondent accompanied Mrs. Carroll to the post office to buy the bonds. When she asked him who to name as payee on death, the record discloses that he said, " 'Well, it's your money Mrs. Carroll, I guess you can do as you see fit,' " and did not advise her that her living husband should be such payee. Instead, respondent justified his being so named as follows:

" . . . *She was under the same impression that I was, that Mr. Carroll would never recover. We each treated him, so far as inheritance was concerned or use of the money, as dead.* He had never been anything but an animal from that time on. He would never be Fred Carroll again." (Italics ours.)

Respondent further testified: "Had Mr. Carroll become cured by some miracle while these bonds were still in my possession, I would simply have given them to him."

As above indicated, the findings of fact of the Board of Governors relative to the bond transaction are, in this regard, supported by the record.

Further, until the death of Laura Carroll, the United States savings bonds were in the possession of Martha Ulrich, as guardian of both Frederick J. and Laura Carroll. The bonds were kept by the guardian in a safe-deposit box at the bank. The guardian, having implicit confidence in respondent, gave him a key to the deposit box. Upon the death of Laura Carroll, the respondent, without the knowledge or consent of the guardian, removed all of the contents from the box, retained the bonds in question, and caused them to be reissued in his name, with his wife as the payee on death. The guardian, being responsible to the court for the securities in her possession, demanded that the bonds be returned. Respondent refused to return them, contending that the bonds were a gift to him from Laura Carroll. The fact that he believed at the time that his claim to the

bonds was valid does not justify his surreptitiously taking them from the possession of the guardian, who was, under the law, solely accountable to the court for the safekeeping of the assets of her ward.

Respondent's admitted taking of these assets from the possession and control of his client, the guardian of the estate of Frederick J. Carroll, and converting them to his own use, violated his oath of attorney and the Canons of Professional Ethics.

Further, when the guardian was unable to obtain possession of the bonds, she sought the advice and counsel of another law firm. This firm wrote to the respondent demanding the return of the bonds, and threatening to institute an action for his removal as attorney for the estates. After receiving the letters, the respondent went to the home of the guardian and told her that he had been in touch with a member of the firm, and that he would not be sued, as she had been advised, because they were good friends and members of the same profession. He persuaded her to approve a letter written by him and addressed to the firm, in which he indicated that there was no longer any need for the firm's services for the reason that his differences with the guardian of the estates had been settled. The letter inquired as to the amount of the fee, and stated that Mrs. Ulrich would arrange to pay for the services rendered.

Upon receipt of this letter, an attorney from the firm contacted Mrs. Ulrich by telephone, informed her that Mr. Simmons had not contacted the firm, assured her that Mr. Simmons would be sued by the firm, and that the action for his removal as attorney for the estates would be prosecuted to its conclusion. Mrs. Ulrich, realizing that she had been deceived by the representations of the respondent, then authorized the firm to proceed with the removal action and recovery of the bonds or the value thereof. January 9, 1957, respondent was removed as attorney for the estates by order of the court.

The false representations made to the guardian in respondent's attempt to have her abandon the causes of

action against him, and his false statement to opposing counsel that the bond matter had been adjusted, constituted conduct in disregard of his professional duties and responsibilities.

Respondent next contends that he did not overreach Mrs. Carroll because he was not aware of her mental inadequacies at the time in question. That respondent was aware of Mrs. Carroll's incapacity to comprehend the consequences of her business transactions is supported, not only by the testimony of Mrs. Ulrich, but by a letter, dated June 20, 1949, written to respondent by Owen P. Hughes, who stated that the accident settlement involving Frederick J. and Laura Carroll must have court approval because,

" . . . *From what I understand and from what you have stated, Mrs. Carroll is in rather a precarious mental condition,* and we do not want to be in a position of having any release from her subject to criticism or attack at a later time." (Italics ours.)

We find no merit in respondent's contention that the record does not support the findings of the trial committee and the Board of Governors.

(2) Respondent next contends that he "realized no monetary gain whatsoever and, furthermore, never truly expected to."

Restitution by respondent was not voluntarily made. Repayment was steadfastly refused by him until the day before the cause was to be tried in the superior court, and after the estate had expended $2,366.68 in attorneys' fees and costs to regain $4,495.80 which the respondent had wrongfully appropriated to his personal use. Restitution means to restore to a status quo. Even complete restitution is not a defense and, in the instant case, the alleged restitution lacked $2,366.68 of being complete. *In re Peterson,* 56 Wn. (2d) 187, 351 P. (2d) 533 (1960). See, also, *In re Walsh,* 40 Wn. (2d) 593, 244 P. (2d) 868 (1952).

We find no merit in this contention.

For the reasons stated, we adopt as our factual findings those of the Board of Governors.

The oath of attorney (Rule for Admission to Practice 5, RCW Vol. 0) provides in part: "I will abide by the Canons of Professional Ethics approved by the supreme court of the state of Washington."

The Canons of Professional Ethics (RCW Vol. 0) apropos to this proceeding are:

Canon 11: "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

Canon 29: ". . . He [the lawyer] should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice."

Canon 32: ". . . But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen."

Rule for Discipline of Attorneys 1, RCW Vol. 0, provides in part:

"An attorney at law may be censured, reprimanded, suspended, or disbarred for any of the following causes, hereinafter sometimes referred to as violations of the rules of professional conduct:

"A. The commission of any act involving moral turpitude, dishonesty, or corruption, whether the same be committed in the course of his relations as an attorney, or otherwise, . . .

"C. Violation of his oath or duties as an attorney."

See RCW 2.48.220.

■■ The conduct of the respondent was violative of the oath of attorney and the cited Canons of Professional Ethics. The trial committee has recommended a reprimand; the Board of Governors suspension from the practice of law for one year. These recommendations are advisory only. It is exclusively the function of this court,

when an attorney has been found to have violated his trust, either to rescind the privilege of practicing law in this state or to suspend it, and, if suspended, to fix the time when and the conditions upon which the privilege may be exercised in the future. *In re Ballou,* 48 Wn. (2d) 539, 295 P. (2d) 316 (1956); *In re Case, ante* p. 181, 367 P. (2d) 121 (1961). In making this determination, we consider the seriousness and circumstances of the offense and these standards: (1) Punishment of the offender, which should be sufficient to prevent reoccurrence, (2) a penalty sufficient to deter other practitioners from engaging in such conduct, and (3) punishment sufficient to restore and maintain respect for the honor and dignity of the profession, and to assure those who seek the services of attorneys at law that the penalties for unprofessional conduct will be strictly enforced. *In re Ballou, supra; In re Case, supra.*

Applying these standards to the violations of respondent, we approve the recommendation of the Board of Governors, and it is ordered that J. Lael Simmons be suspended from the practice of law in the state of Washington for a period of one year commencing May 21, 1962.

ALL CONCUR.

---

May 21, 1962. Petition for rehearing denied.